[Civ. No. 14489.   First Dist., Div. One.   Apr. 29, 1952.]

F. M. HEFFERNAN, Plaintiff and Respondent, v. BEN-
NETT & ARMOUR (a Corporation), Appellant; JOHN
LAWLER, as Trustee for Benefit of Creditors, etc., De-
fendant and Respondent.

Vincent Hallinan for Appellant.

G. D. Schilling, Erskine, Pillsbury & Tulley, Appel, Lieber-mann & Leonard for Respondents.

WOOD (Fred B.), J.—Defendant, Bennett & Armour, a corporation, appeals from a judgment rendered against it in an action brought by plaintiff F. M. Heffernan (hereinafter called respondent), assignee of Challenge Cream & Butter Association, a corporation, a creditor of Bennett & Layton, Inc., a corporation, to set aside as fraudulent the transfer of certain assets and the payment of $16,000 by Bennett & Layton, Inc., to Bennett & Armour in 1938 and 1939. Defendant also appeals from orders appointing a receiver, permitting amendment of the complaint to conform to the proof and to add a party defendant, and denying a motion to set aside those orders and the judgment, findings of fact and conclusions of law.

Upon the first hearing of this appeal, we concluded that the trial court had lost jurisdiction of the action because not brought to trial within the five-year period required by section 583 of the Code of Civil Procedure, as extended by the period of the pendency of an appeal from an order denying a motion for change of venue (Cal.App. [230 P.2d 658]). Respondent petitioned for a rehearing and brought to attention the fact that the period in question included "holi-

days (other than special holidays) appointed by the President or by the Governor'' (Code Civ. Proc., § 12a) sufficient in number to extend that period (under section 12a as interpreted and applied by section 7 of chapter 29 of the Statutes of 1933, page 304, at page 306) beyond the day when this action was brought to trial. Accordingly, we granted a rehearing.

Upon the second hearing we held that because of the intervening holidays the action was brought to trial within the five-year period, and considered and determined the remaining issues presented upon this appeal (Cal.App. [239 P. 2d 129]). Respondent petitioned for a rehearing upon several grounds, including a request for more specific instructions as to further proceedings in the trial court, particularly as concerns some 97 creditors for whose benefit, as well as his own, respondent claims he brought this action. For the purpose of formulating such instructions we granted a rehearing and submitted the cause forthwith. Our decision upon this hearing is substantially the same as that rendered upon the second hearing save for the addition of the requested instructions.

■ We hold, for the reasons indicated, that this action was brought to trial within the five-year period required by section 583 of the Code of Civil Procedure.

We will next consider the sufficiency of the evidence to support the findings of fact. A summary of certain facts concerning which there is no conflict in the evidence, will aid the discussion.

In 1923 or 1924, A. N. Bennett purchased a creamery plant in Susanville, California, and engaged in business as a dealer in poultry and dairy products. He incorporated the business under the name of Bennett & Cardinal and, in 1933, then owner of all issued stock of the corporation, sold half of the stock to Walter B. Layton for $50,000, Layton paying $5,000 in cash and giving his note to Bennett for $45,000, secured by a pledge of Layton's stock to Bennett. They changed the name of the corporation to Bennett & Layton, Inc., hereinafter called Bennett & Layton.

Soon thereafter, at the instance of Layton, they enlarged the scope of the business, opening an office in San Francisco. They continued to operate the Susanville plant, through a branch manager. By 1937 differences had arisen between Layton and Bennett, leading to conversations between them concerning a separation of their interests and a parting of

the ways, Bennett to take the Susanville properties and Layton to continue on with the remainder of the business. February 24, 1938, Bennett made a written offer to the corporation to exchange his 735 shares of its stock for the real estate, business equipment and current accounts receivable belonging to the corporation in Lassen County, which offer was accepted by the board of directors and the stockholders of the corporation.

Bennett planned to incorporate the Susanville business and for that purpose organized the appellant corporation March 21, 1938, which occurred, as it happened, after some of the instruments of conveyance had been executed. After the incorporation, Bennett transferred to appellant those of the Susanville properties and rights which had been conveyed to him prior to appellant's incorporation.

In effecting this transfer, Bennett & Layton executed and delivered (1) to A. N. Bennett, its bill of sale dated March 1, 1938, conveying all of its Susanville personal property and bills receivable, he to assume all bills payable thereat; (2) to appellant, a deed dated March 15, 1938, conveying the Susanville real estate and improvements; (3) to appellant, an assignment, dated March 23, 1938, of the items listed in its Susanville supply inventory of December 31, 1937, and in its list of accounts receivable of March 2, 1938; and (4) to appellant, its bill of sale dated July 15, 1938, conveying certain automotive equipment, reciting that the transfer thereof had been effected by endorsing the registration cards.

For these properties and rights, appellant issued 1,000 shares of its capital stock, of the par value of $100 each. Of those shares, E. L. Armour purchased half for $50,000, paying Bennett $5,000 and giving Bennett his note for the balance, secured by a pledge of Armour's stock.

In March of 1938, Bennett & Layton acquired the business and assets of General Poultry Company, composed of or owned by Emanuel Compagno and his sons, Louis and Lawrence, engaged in the produce business as wholesalers. The Compagnos received therefor 567.75 shares of the capital stock of Bennett & Layton. Of these, 167.75 shares came from Layton's stock, 400 from the stock which Bennett had turned in for the Susanville properties. As a result, Bennett & Layton then had 1135.5 shares issued and outstanding, owned in equal amounts by Layton and by the Compagnos.

By March of 1938, Layton's indebtedness to Bennett had increased. He gave Bennett two notes therefor, one for

$8,000, the other for $54,148.59, dated March 1, 1938. The larger note was payable at the rate of $500 per month and was secured by a pledge to Bennett (dated March 23, 1938) of Layton's 567.75 shares, a $17,000 note of Emanuel Compagno, and (to the extent of the amount of the latter note) of Compagno's 133.75 shares of Bennett & Layton stock. Layton also gave Bennett a proxy to vote Layton's stock in certain contingencies, until payment of the $54,000 note. As added security, Layton agreed to pay Bennett 90 per cent of all dividends thereafter accruing to him; that he would secure from Compagno an assignment of his dividends; would cause dividends of not less than 50 per cent of net earnings to be declared whenever such earnings exceeded $5,000 annually; that the number of directors of Bennett & Layton would not exceed three; that W. B. Finnell would be a director and officer of and Bennett's representative in the corporation; that the books would be open to the inspection of, and could be audited by, Bennett at any time; that Layton would not draw a salary exceeding $750 per month, nor permit Compagno to do so, nor permit the payment of salaries of personnel which would impair the capital assets; that, without the approval of Bennett, no increase in the salaries of officers or executives and no investment in real estate or equipment exceeding $5,000, would be made; and if any payment on the note should be in default for 20 days, Bennett could terminate the agreement, sell the collateral at public or private sale, and be a purchaser at the sale. Finnell had been secretary and treasurer of the corporation since 1933. March 23, 1938, he was confirmed in those offices and elected a director. He continued to serve in each of the three offices until June, 1940.

During the period March to July, 1939, Bennett & Layton paid appellant various sums of money, a total of $16,000.

In June, 1940, Bennett & Layton ceased to do business as a going concern, and, on July 16, 1940, executed to one John Lawler, as trustee for the benefit of its creditors, an assignment of its assets for the benefit of creditors. He liquidated those assets, realizing thereon and paying to the creditors 14 cents on the dollar.

We will now consider the findings of fact and the asserted insufficiency of the evidence to support them, guided by "the time honored rule that all substantial conflicts must be resolved in favor of the respondent, and all legitimate and reasonable inferences indulged in to uphold the findings if

possible.'' (*Richter* v. *Walker*, 36 Cal.2d 634, 640 [226 P.2d 593].)

▓▓ (1) *Concerning the transfer of the Susanville business and property,* the trial court found:

March 1, 1938, Bennett & Layton transferred to A. N. Bennett, for transfer by him to appellant, a corporation he was about to form, all of the Susanville business and property except the real property and equipment, which latter it conveyed to appellant on or about March 15, 1938; appellant was incorporated March 21, 1938, whereupon Bennett conveyed to it that portion of the business and property theretofore conveyed to him, and appellant issued to. Bennett 499 of its shares of stock, par value $100 each, to E. L. Armour 499 shares, and to Kenneth Cain 2 shares, which Cain held, one for Bennett and one for Armour.

At the time of the transfer, the Susanville assets were unencumbered and worth $100,000, subject to current bills and accounts payable in the sum of $11,000, and constituted the principal unencumbered assets of Bennett & Layton.

After the transfer, Bennett & Layton had net current assets of $12,554.96, unsecured liabilities of $79,814.58, and liabilities of $393,519.16, secured mainly by turkeys in storage in San Francisco and eastern cities subject to great and unpredictable changes in price.

Three or four weeks after said transfer, Bennett & Layton secured additional capital in the form of net assets of General Poultry Company, approximately $57,000, but as a distinct and separate transaction.

In respect to these findings, the principal issues are whether or not the withdrawal of Bennett and the coming in of General Poultry Company constituted a single transaction or separate and independent transactions, and, in either case, the resultant financial condition of Bennett & Layton.

That they were separate and independent finds support in the facts, among others, that Bennett's offer of February 24, 1938, was simply to exchange his stock for the Susanville business and properties (not dependent upon any other factor), which offer the directors and stockholders accepted. The motion of the directors to acquire the assets of General Poultry Company recited that it was agreed to offer therefor ''400 shares of treasury stock *heretofore* acquired from A. N. Bennett.'' (Italics added.) Bennett testified he did not like General Poultry Company's way of doing business; thought them unsatisfactory; believed it an unwise move

to take them in, and told Layton so; that Layton finally decided to do so but did not tell Bennett that he intended to do so; and that Bennett had nothing to do with the negotiations between Layton and General Poultry. Asked if the Bank of America was a creditor of Compagno Brothers (General Poultry Company), Bennett said he did not know, that he "had nothing to do with Compagno Brothers." Asked if Bennett & Layton assumed the liabilities of Compagno Brothers when they went in, he said, "That was after I stepped out," and that he did not know the condition, that he "had nothing to do with Compagno Brothers." Although there is evidence which would support a contrary finding, it but produces a conflict which it was the function of the trial court to resolve. Whether the court really did resolve it is cast in doubt by a finding, later discussed herein, that Bennett used the control over Bennett & Layton which his agreement of March 21, 1938, with Layton, and the pledge of the Layton and Compagno stock, gave him, to effect the transfer and to require the payment of the $16,000. Whether the transfer was a complete transaction with or without the acquisition of the General Poultry assets, is not a determinative factor, as will develop.

The finding as to the value of the Susanville assets is supported by the book value thereof on February 28, 1938 (real estate, buildings and equipment, $65,094; cash, accounts receivable, and merchandise, $33,355.51; current liabilities, $11,079.22) ; the fact that appellant acquired these assets and assumed the liabilities in exchange for 1,000 shares of its stock, of the par value of $100 each, and, when entering the assets upon its books, included $11,477.35 for the good will of the business; the fact that Armour purchased his half interest in appellant for $50,000; and the fact that Bennett, in a statement which he made to a bank, April 18, 1938, valued the real estate and building at $50,000 and the machinery and equipment at $45,000. Appellant would minimize those values by the fact that the Susanville plant had sustained certain losses during recent years. But those losses had already been written off, reducing the book value of the investment by the amount of those losses, and Bennett, before he withdrew, expressed the belief that if the Susanville plant were properly managed (it had been conducted in recent years by a branch manager) it would be a paying investment.

The findings as to the financial condition of Bennett & Layton after the transfer of the Susanville property and

before the acquisition of the assets of General Poultry Company are supported by the books of Bennett & Layton, with some modifying adjustments, according to the testimony of A. G. Strong, certified public accountant, and Fred Watwood, licensed public accountant. The principal adjustment related to a book entry showing a liability of $39,902.93 for accrued salaries of Bennett, Finnell, and Layton, which was written off, as it happened, at the time of the transfer to Bennett & Armour. It never was a real obligation of Bennett & Layton, having been entered for income tax purposes only. Its cancellation had nothing to do with the transfer. Canceling it at the time of the transfer, instead of prior thereto, gave the appearance of an excess of current liabilities over current assets, instead of the opposite, and of a markedly depressed net worth, prior to the transfer.

Appellant claims that the book value of the turkeys in stock on February 28, 1938, was below the then market price and should be adjusted upward, to show the true financial condition of the corporation at and after the transfer. But there was substantial evidence to support the book values. George Makins, engaged in the poultry business for many years, considered the inventory value of the turkeys very fair, said it represented a fair market value in the eastern and domestic markets at the time. Watwood computed the gross market value over book at $34,000, from which he deducted estimated carrying charges of $22,000, making a net increase of $14,000, Strong computed the excess of market price over book value at $22,121.31, from which he deducted carrying charges of $8,792.39, leaving a net of $13,328.92. Strong further testified that it is not good accounting practice to take into account an increase in price, that it is an axiom of accounting and business practice to value inventories at cost or market, whichever is lower. The book values were based upon cost of the turkeys and other products.

The withdrawal of the Susanville business left unchanged the amount of the corporation's current assets (cash, accounts receivable, and merchandise, principally turkeys), $485,-888.70, and current liabilities (loans secured by pledge of merchandise, unsecured loans, and accounts payable), $473,-333.74. The transfer reduced other assets from $172,164.17 to $79,529.34. The latter included store and office equipment, $2,906.47, and investment in two buying stations at Corning and Willows, $70,282.65, of which about $40,000 represented advances to turkey growers and the remainder

investment in buildings and equipment. Finnell testified that the Corning and Willows assets were more or less frozen. Strong, in 1940, appraised the net worth of these two branches at $12,283.86. Upon liquidation, they brought $11,396. J. B. Grassens, who assisted the trustee in liquidating the assets, testified that the Corning and Willows accounts proved practically uncollectible. Bennett wrote the trustee in July, 1940, that among the Corning old accounts there were a lot of "stingers," that some of the old accounts were valueless, others could be collected in part. He did not think any of them could be collected in full. This $70,000 item of overvalued assets, not usable for raising money in case of need, is of special significance when considered in the light of the net worth of the corporation: $184,000 before, $92,000 after, the transfer. The evidence would support a finding that the net worth, after, was $34,000. It was susceptible to a further reduction in the amount of a $3,346.41 charge against Bennett, which Bennett never recognized or paid and which was later written off. There is evidence indicating it was entered upon the books to give the appearance of equal net worth to the business and property withdrawn and that which remained. Without such an offset, the withdrawal of the Susanville plant ($95,981.24) would reduce the net worth to $88,737.89. The principal remaining asset was merchandise, mainly turkeys, valued at $402,000, approximately, pledged for loans amounting to $393,000, with unsecured liabilities of $79,000, accounts receivable of $71,000, and $12,000 in cash, or net current assets of $12,554.96.

General Poultry Company brought to Bennett & Layton current assets, approximately, of $65,100 (cash, $2,700; accounts receivable, $26,900; merchandise, $35,500); current liabilities of $18,700, unsecured. This increased Bennett & Layton's net current assets by $46,400, bringing that item to about $58,954. The only other assets which General Poultry brought to the corporation consisted of equipment, $10,200, and prepaid expenses, $350. The resulting net worth of Bennett & Layton was $149,000. This evidence supports the finding that General Poultry Company brought in assets of $57,000.

(2) *The court found that the transfer was made and the $16,000 was paid without a fair, valuable, or any consideration.* The only consideration for the transfer of the Susanville business and property was the acquisition by the transferor of 735½ shares of its capital stock theretofore owned

by Bennett, which the court found was in violation of section 342 of the Civil Code. Although the legality of such acquisition by the corporation may not be subject to direct attack in this action, the corporation by this device stripped itself of a substantial portion of its assets without a tangible return and thereby materially changed its financial position.

The $16,000 was paid by Bennett & Layton directly to appellant, in part by checks payable to appellant, in part by checks to banks in payment of drafts which appellant drew upon Bennett & Layton. The payments were made at the urgent insistence of Bennett, evidenced by a series of letters from him to Layton and to Finnell. There is evidence that during the period of these payments, Bennett & Layton was losing money. In addition, the corporation paid directly to Bennett $12,000 over a period of about two years, as a credit upon the Layton note. Bennett testified that these payments and the $16,000 payment to appellant were made pursuant to the contract between him and Layton whereby Compagno and Layton were to draw $750 a month each, of which they were to receive $500 in cash, each, and of the remainder, Compagno was to pay $250 to Layton and Layton to pay $500 to Bennett, to apply on the note; and that he received credit for the $16,000 on appellant's books. It was stipulated that Bennett & Layton charged the $16,000, one half to Layton and one half to Compagno. It is clear that Bennett & Layton paid and appellant received the $16,000. That this payment was without consideration is supported by the inference the trial court drew that the excess salary arrangement was but a device to siphon off to Bennett moneys which the corporation did not owe, a reasonable inference under all of the surrounding circumstances.

█ (3) *Concerning intent and purpose,* the court found that the transfer was made and the $16,000 was paid (a) in contemplation of the insolvency of Bennett & Layton, (b) at a time when Bennett & Layton was engaged in or about to engage in a business for which the remaining property was an unreasonably small capital (after as well as before the acquisition of the assets of General Poultry Company), and intended and believed it would incur debts beyond its ability to pay as they matured, and (c) with actual intent to hinder, delay, defeat, deceive and defraud its existing and future creditors; facts known to the transferee at the time of the transfer and of the payment of the $16,000.

The evidence supports these findings.

The differences concerning business policies developed in 1937 and culminated in the withdrawal of Bennett. Finnell testified that Layton was expanding the business more rapidly than Bennett desired, and made contracts and deals without consulting Bennett; that Bennett did not consider Layton should make deals without consulting him, because his money was in there and it might be lost. Bennett testified that Layton wanted to carry a big volume of goods for a long profit, a speculative profit, whereas Bennett wanted a rapid turnover at a small profit. When Layton persisted in buying large quantities of turkeys, Bennett objected and threatened to cause the business to be liquidated. Bennett then suggested that Layton buy him out, Bennett to take the Susanville business in part payment. Layton, according to Bennett, did not reply but immediately began to try to get someone interested so they could separate, so that Layton could go on with the business and Bennett could resign and get his money, because Layton did not have any credit and did not have the money to carry it on himself; Layton had to acquire added money in order to operate Bennett & Layton, with or without the Susanville business, if Bennett withdrew his support; Bennett was the financial support of Bennett & Layton, with his securities and personal guaranty to the bank for the firm's indebtedness, without which Layton did not have the money to go ahead unless he could acquire outside moneys. The witness Grassens testified that Bennett told him the reason he "pulled out" of Bennett & Layton was that Layton was a gambler, wanted to speculate heavily in long pull deals, to make a "killing," and that Bennett was somewhat concerned in view of the inclination of Layton to gambling, —something might happen to the affairs of the corporation, thereby putting it in a rather precarious financial condition. Finnell said that upon Bennett's leaving it was necessary for Layton to bring new capital into the business if he were to continue the business on the same scale; what was left was not sufficient to carry on the business as they had previously carried it on; his credit was what hurt him more than anything else. Bennett said that after his withdrawal it would be perfectly natural that Layton would get some credits or moneys or guaranties before he could continue.

The evidence showed that the market price of turkeys is subject to rapid fluctuations, relatively large rises and falls. Strong testified that in view of these fluctuations, such a

business was speculative, that net current assets of $12,500 with current liabilities of $473,000, would not be sufficient to properly take care of Bennett & Layton should an adverse situation arise, that a drop of one cent in the market price would have completely offset the working assets. Makins testified that the turkey business is very much a speculative business; that with current assets exceeding current liabilities of $473,000 by $12,500, he would not think the company was in a safe condition, he would think it was "practically broke." He also said that if current assets exceeded current liabilities of $492,000 by $58,000, he would say they were skating on pretty thin ice with that amount of capital. Strong said that with net current assets of $58,000 the corporation would be on the border line of being extended, but its operating position was sounder than before. Its net worth was $184,000 before and $92,000 after Bennett's withdrawal, increasing to $149,000 after acquiring General Poultry. If the Corning and Willows stations were depreciated $58,000, as the evidence would justify, those figures would be $126,000, $34,000, and $91,000, respectively. In contrast, appellant acquired a business that had a net worth of $95,000, which included real estate, building and equipment valued at $65,000, and current assets of $33,000, with total liabilities of but $11,000, —net current assets of $22,000.

These facts support the findings expressed in clauses (a) and (b) of paragraph 3, above, and are corroborated by the fact that Layton continued on the course which had made Bennett apprehensive, inducing him to withdraw. Upon the cessation of business in June, 1940, Bennett & Layton had nearly 4,000,000 pounds of turkey on hand, heavily encumbered, with market prices falling. We do not hold that the facts thus found necessarily establish constructive fraud under sections 3439.05 and 3439.06 of the Civil Code, as they were enacted subsequent to the questioned transaction. Such facts are of significance for the bearing they may have upon proof of actual intent to defraud.

These facts, with other facts, and the inferences which reasonably may be drawn therefrom, support the finding of actual intent to defraud creditors.

Such an intent, except as otherwise provided by statute, never arises as a matter of law from the existence of any given set of facts. It must be proved just as any other material fact in issue. Its proof is peculiarly dependent upon the circumstances which surround the questioned

transaction, and the inferences which the trier of the facts may reasonably draw therefrom. "From the very nature of the action [to set aside conveyances as having been made in fraud of creditors] direct proof of the fraudulent intent of the parties is an impossibility. For this reason and because the real intent of the parties and the facts of the transactions are peculiarly within the knowledge of those sought to be charged with the fraud, proof indicative of fraud must come by inference from the circumstances surrounding the transaction, the relationship and interest of the parties." (*Fross* v. *Wotton,* 3 Cal.2d 384, 393 [44 P.2d 350] ; see, also, *Moore* v. *McDonald,* 122 Cal.App. 61 [9 P.2d 556], and authorities reviewed at pp. 69-70.)

Bennett's own statements concerning the reasons for his withdrawal furnish some support for an inference that he desired to salvage the Susanville business (which he had developed and thought well of) and keep it out of the reach of creditors, should Layton's speculative operations result in financial difficulties.

The heavy indebtedness of Bennett & Layton and the depletion of its working assets to a narrow margin, in view of the speculative character of its business and the need for ready assets, coupled with inadequate consideration for the transfer of the Susanville property and lack of consideration for the payment of the $16,000, furnish some basis for the inference of an intent to delay and defraud creditors.

Departures from the usual business routine or practice in consummating the transfer also tend to show fraudulent intent. These departures include: unauthorized acquisition of its own stock as payment for the property conveyed; failure to publish and record the notice called for by section 3440 of the Civil Code; and neglect for more than a year to record the deed to the Susanville real property. It also appears that on April 12, 1938, Bennett took appellant's application for a permit (to issue 1,000 shares of its capital stock at par for cash) to the Sacramento office of the corporation commissioner and told the deputy there that he had surrendered his stock in Bennett & Layton in exchange for certain of its property in Susanville and proposed to transfer that property to a new corporation, and would have to take the application back and revamp it. The deputy raised a question concerning the acquisition of this property in exchange for the stock and informed Bennett if the new corporation should apply to issue stock in exchange for this property

it would be necessary to establish that the method of its acquisition was legal, and suggested that Bennett have his attorney prepare a statement to be filed with the application, covering the legality of the transaction, which Bennett said he would do. Bennett did not file the application at Sacramento, nor was any such statement filed. Instead, Bennett filed the application, unchanged, at the San Francisco office of the corporation commissioner, who on April 16, 1938, issued appellant a permit to sell 1,000 shares of its capital stock, for cash, to Bennett, Armour, and Cain. It appears that appellant actually received the Susanville properties, not cash, for its shares. Its books recited the issuing of 1,000 shares to Bennett for cash, but Bennett was debited with $100,000 for the stock and credited with $100,000 as vendor of the properties.

Certain recitals and entries were made in the books of Bennett & Layton that tend to indicate an effort was made to disguise the transaction and give it the appearance of fairness. The minutes of the meetings of the stockholders and of the directors at which Bennett's offer was accepted, contain recitals that the corporation would thereby be released from debts and liabilities of "nearly $80,000.00" and condition the acceptance upon the release by him of all liabilities of the corporation to him. There was no such indebtedness. The corporation did owe him $12,850 for moneys advanced. That debt was not released. It was subsequently paid to Bennett by the corporation.

These same minutes recite it was certified by stockholder Layton that "all current creditors of said corporation had been protected in said transaction and that no loss had, would, or could occur to any creditor of Bennett & Layton, Inc. by virtue of the disposal of said assets in Lassen County." The evidence is conflicting whether the unsecured creditors were paid, and we observe no finding in respect thereto. Bennett said he insisted that all unsecured debts be paid because his then attorney told him that would prevent the transaction from being attacked by any creditors. He said it was not discussed that the deal was of doubtful legality but that if there were no existing creditors it was legal and they could go through with it as they pleased.

The $3,346.41 adjusting entry made on the corporation's books as a charge against Bennett (a charge that was never recognized or paid by him, and was later written off) gave the

appearance of an equal division of assets upon the transfer of the Susanville properties.

The writing off, at the time of the transfer, of the $39,900 of salaries which had been entered for tax purposes and were never intended to be paid, gave the appearance of a transaction less disadvantageous to the transferor than it really was.

The facts which we have narrated support also the specific finding of the trial court that the transferor and transferee corporations were under Bennett's control by reason of his agreement with Layton which gave Bennett a representative upon the board of directors of Bennett & Layton, the pledge of the Layton and Compagno stock, the proxy to vote Layton's stock, and the power to approve or disapprove certain types of corporate transactions, coupled with Bennett's ownership of one half of appellant's stock and pledge of the other half; that he exercised this control to effect the transfer of the Susanville property for the purpose of getting it back free of the claims of creditors, and to require Bennett & Layton to pay Layton's indebtedness to him through the device of paying excess salaries to Layton and to Compagno, all with intent to defraud existing and future creditors of Bennett & Layton. Bennett claimed he had no knowledge of Bennett & Layton's business activities or of its financial condition after the transfer, until its cessation of business in June, 1940. But his representative, Finnell, had full knowledge, and reported to Bennett about once a month and Bennett conferred with Finnell whenever he came to San Francisco, which occurred about once a month. In July, 1939, Layton wrote Bennett that the corporation operated at a loss in March, April and May of that year and would be called upon to take a loss on frozen turkeys, and concurrently Finnell wrote Bennett a letter confirming Layton's statement, adding, "I have been watching out for your interests here and want you to get your money in full as soon as you can, and think you have done pretty well so far." Yet, Bennett continued to demand payment. Bennett admitted that in May or April of 1940 Finnell told him "If the turkey market don't go up we are broke," and that in March or April, 1940, he asked Finnell regarding moneys due him, and Finnell said he did not see how Layton or Bennett & Layton could pay, that "Bennett & Layton are broke, but the bank don't know it." Although Bennett & Layton made no payments to Bennett & Armour after July, 1939, it continued to make payments directly to

Bennett through the bank with whom he had lodged the Layton note for collection. These payments averaged about $500 a month. The first was made April 4, 1938, and the last on May 2, 1940, showing a payment of accrued interest and reduction of the principal to $45,686.92. We cannot say as a matter of law that the court was not justified in inferring that Bennett had and exercised control over both corporations as found, and to the end and with the intent found. As a question of fact, this was peculiarly within the province of the trier of the facts. He had an opportunity to observe the witnesses, including Bennett, who, the record indicates, was quite evasive, by his frequent inability to remember an event or a conversation until confronted with his earlier testimony on the subject, given at the trial or upon deposition or in another action.

■ Appellant is not a bona fide purchaser for value. Whatever might be said of it as an active participant in the questioned transactions, it is sufficient to observe that appellant is charged with knowledge of Bennett's knowledge and intent. He formed the appellant corporation for the purpose of receiving the Susanville property. He received 1,000 shares of its capital stock for that property and was its president and a director. He acted for and on its behalf.

■ Armour, who purchased half of appellant's shares from Bennett, disclaimed having had any such knowledge. That claim is not especially significant because his lack of knowledge as a stockholder would have no real bearing upon appellant's knowledge or lack of knowledge as transferee. However, the court did find upon sufficient evidence that Armour knew, at the time, that the transfer was made and the money was paid with actual intent to defraud existing and future creditors. He was in the employ of Bennett & Layton prior to March 1, 1938. Layton sought to interest him in remaining in a proprietary capacity and Bennett invited him to invest in the Susanville project. He investigated and decided in favor of Susanville, buying a half interest in the new corporation. He participated in securing appellant's permit to issue stock. He supervised the keeping of appellant's books. He testified that Bennett talked to him about all the details of the transaction whereby Bennett took over the Susanville plant and Layton took over the San Francisco plant.

(4) *The evidence supports the finding that the trustee liquidated the assets of Bennett & Layton in an orderly and*

*businesslike manner,* but that finding and the finding that Bennett & Layton failed as a proximate result of the questioned transfer because of the unreasonably small capital remaining in its hands after the transfer, do not appear material.

(5) *The evidence supports the finding that respondent's assignor was not a creditor at the time of the questioned transactions, but that subsequently Bennett & Layton became indebted to it* in the sum of $24,277.78, no part of which has been paid except $3,398.84. Bennett & Layton and respondent's assignor had business dealings during the period 1936 to 1940, but no indebtedness accrued until early June, 1940.

It appears that no judgment has been heretofore sought or obtained upon the assigned claim, but the requirement that a creditor may avoid the act of his debtor for fraud "only where the fraud obstructs the enforcement, by legal process, of his right to take the property affected by the transfer" (former Civ. Code, § 3441 repealed in 1939) no longer obtains. As a procedural change, the repeal applies retroactively to a transfer which occurred prior to the repeal. (See *Heffernan* v. *Bennett & Armour,* 63 Cal. App.2d 178, 183-184 [146 P.2d 484], and *Rice* v. *Schubert,* 101 Cal.App.2d 638, 639 [226 P.2d 50].)

(6) *The findings that respondent's assignor was not put upon inquiry* as to the transfer or payment or the circumstances surrounding them *and did not acquire knowledge of the fraud until June of 1940, and that this action is not barred* by laches or by sections 338 or 343 of the Code of Civil Procedure, are supported by the evidence.

Appellant directs attention to a banquet given Bennett in March, 1938, attended by officers of respondent's assignor, as putting creditors and potential creditors upon inquiry. But the emphasis there was upon Bennett's "retirement" and there is evidence that the impression given was that he was retiring completely from business, returning to his old home in Susanville. Appellant also invokes a report on Bennett & Layton made by Dun & Bradstreet in April, 1938, but there is evidence that respondent's assignor did not see any such report until June, 1940. It cannot be asserted as a matter of law that these facts would put a person upon notice of the nature of the questioned transfer, particularly a firm that was doing business with Bennett & Layton on a satisfactory current payment basis before and until more than two years after the transfer.

This action was filed December 7, 1942, about two and one-half years after respondent's assignor was put upon inquiry and its cause of action arose.

(7) *The court found untrue the allegations of appellant's answer that respondent holds the assigned claim for the Bank of America,* that this action was instituted at the instigation of the bank, and that the bank is the real party in interest in this action. The effect of this finding is to indicate that respondent was proceeding upon the strength of the claim of his assignor, Challenge Cream & Butter Association. As indicated below, appellant's defenses, if it has any, to the claims of the other creditors of Bennett & Layton represented by respondent in this action must be determined when those creditors appear or are brought before the court. Thus, it is immaterial and outside of the issues that the court found that the failure of Bennett & Layton was not caused by the alleged carelessness of the bank in lending credit to the corporation to gamble upon the turkey market, and the finding that through this action the bank does not seek to recoup gambling losses incurred by Bennett & Layton with the bank's knowledge, credit, and assistance.

### The Conclusions of Law and the Judgment

From the finding that the property was transferred and the money was paid with actual intent to defraud existing and future creditors, the trial court correctly concluded and decreed that the transfer and payment were void as against plaintiff as a creditor of the transferor and should be set aside for the benefit of plaintiff, and rendered judgment to that effect. ▪ In view of former section 3439 of the Civil Code and sections 154 and 531 of the Penal Code, a transfer made with actual intent to defraud creditors is void, for illegality, as to any creditor and may be attacked by any creditor, whether an existing or a future creditor. (*Severance* v. *Knight-Counihan Co.,* 29 Cal.2d 561 [177 P.2d 4, 172 A.L.R. 1107]; *Sasaki* v. *Kai,* 56 Cal.App.2d 406 [133 P.2d 18].) It does not matter if the transferor retains property ample to pay his creditors. (*Adams* v. *Bell,* 5 Cal.2d 697, 700-701 [56 P.2d 208]; *Security-First Nat. Bank* v. *Bruder,* 44 Cal.App.2d 767, 773 [113 P.2d 3].) Nor is it important to ascertain whether or not a finding of no consideration is supported by the evidence. (*Puccetti* v. *Girola,* 63 Cal.App. 2d 240, 251 [146 P.2d 714].) In such a case, the fact that

the transferee gave consideration is immaterial. (*Chichester v. Mason*, 43 Cal.App.2d 577, 586 [111 P.2d 362].)

The next step, logically, would be for the judgment to provide, in some appropriate manner, for the payment of respondent's claim out of the property and money fraudulently transferred. That, this judgment does not do. Instead, it turns all of the property and the money (with the rents, issues, and profits of the property and interest at 7 per cent on the money) over to Lawler, assignee for the benefit of creditors. Starting with the premise that this transfer and payment was void as to all creditors (correct enough in the abstract), it declares that title to these assets never passed to appellant, that title remained in the debtor and passed to Lawler under the debtor's subsequent assignment to him, and thus are assets (the only remaining assets) of the debtor in Lawler's hands for distribution. The judgment then implements this declaration by directing appellant to transfer these assets to Lawler within 10 days; failing which, the transfer will be made on appellant's behalf by a commissioner appointed by the court.

The first error in this line of reasoning is the assumption that title did not pass to appellant. Title did pass, subject to attack only by members of the protected class, each of whom must pursue the property in a timely and appropriate manner, successfully to subject it to his claim. A transfer in fraud of creditors is valid as to the grantor and all persons claiming under him, "and as to all persons except creditors of the grantor who may question it in a proper proceeding." (*Moore* v. *Schneider*, 196 Cal. 380, 385 [238 P. 81]; see, also, *First Nat. Bank.* v. *Eastman*, 144 Cal. 487, 489-490 [77 P. 1043, 103 Am.St.Rep. 95, 1 Ann.Cas. 626].) This is not a case in which by the very terms of the fraudulent transfer the transferee holds the bare legal title and the debtor retains full beneficial interest in the property, as was the case in *Alhambra Bldg. & Loan Assn.* v. *DeCelle*, 47 Cal.App.2d 409, 412 [118 P.2d 19].

Lawler, as the debtor's assignee for the benefit of its creditors, has no greater right to the properties and moneys involved in this action than has the debtor. An assignee for the benefit of creditors is not "regarded as a purchaser for value, and has no greater right than his assignor had, in respect to things in action transferred by the assignment." (Civ. Code, § 3460.) The assignment does not carry with it to the trustee title to property which the assignor has pre-

viously transferred in fraud of creditors. ▮▮▮ Such an assignee, as distinguished from the assignee in insolvency, may not bring an action to set aside a conveyance as made in fraud of creditors. (*Smith* v. *Kirkpatrick*, 208 Cal. 417, 419-420 [281 P. 616], and cases cited.) Indeed, Lawler does not even have the status of a statutory assignee. He is a mere voluntary assignee for the benefit of creditors.

The order for a transfer from appellant to Lawler is equally unfounded in law. Respondent contends that this is a representative action, that in such an action it becomes necessary, upon giving judgment for plaintiff, for the court to determine "a proper method by which the creditors should be 'convened' for the apportionment of the fraudulently conveyed property among them," and that "The simplest and most expeditious way of doing this was through John Lawler, who was already trustee for creditors under the Bennett & Layton assignment." That might be simple and expeditious but it is not legal. Respondent invokes a sound principle, that of doing complete justice by administering and selling the property and distributing the proceeds among those persons who, parties to the proceeding, establish the validity of their claims as creditors. But a conveyance of the property to Lawler is not that. For then the court's jurisdiction and powers of supervision cease. That is taking property from one person and giving it to another without a hearing. What opportunity, in such a case, would appellant have to challenge the validity or the amount of any creditor's claim, his diligence or laches in pursuing it, and whether barred or not by the statute of limitations?

▮▮▮ The transferee, in this case the appellant, is a necessary party in an action to declare a transfer void as fraudulent. (*Liuzza* v. *Bell*, 40 Cal.App.2d 417, 424 [104 P.2d 1095] and cases cited.) The residue, if any, after the claims of creditors are satisfied, goes to him. (Idem., p. 430.) In *Miller* v. *Kehoe*, 107 Cal. 340 [40 P. 485], the court affirmed that portion of a decree (in a creditor's suit) which adjudged the transfer void, declared the amounts due the several creditors (parties to the action), ordered that a receiver appointed for the purpose sell the property and distribute the proceeds among the creditors in accordance with their respective rights, and declared that the residue should go to the transferee. In *Wright* v. *Salzberger*, 121 Cal.App. 639 [9 P.2d 860], the court reversed a decree which adjudged that the transfer be canceled and declared the plaintiff creditor owner of the

property, and directed the trial court to enter a decree declaring, in part, that the transfer "is void as to the plaintiff so far as necessary to liquidate the latter's claim" (p. 646); and, if the trial court deemed it necessary, to provide for a sale of the property under the court's direction. The Uniform Fraudulent Conveyance Act, adopted in 1939, observes this limitation upon the remedial rights of a creditor. It declares that a creditor, when his claim has matured, may, as against a person who is not a bona fide purchaser for value or the successor of such a purchaser, "Have the conveyance set aside . . . to the extent necessary to satisfy his claim" (Civ. Code, § 3439.09).

The rights of each creditor are separate and independent from those of each of the others. Due process requires that the transferee have his day in court as to each, an opportunity to require each to prove his claim, and to present every defense he may have to each. The mere fact that the creditors seek to satisfy their claims out of the same piece of property, does not alter the nature of their several rights, does not make it legally possible for one who has been diligent and whose claim is not barred by the statute of limitations, to pursue his action to judgment and then share the fruits of his victory with the other creditors free of challenge by the transferee as to the validity and amounts of the claims of the other creditors against the debtor or the diligence of their pursuit of the property.

Another factor which requires that the other creditors submit their claims to a court of competent jurisdiction, in an action to which the transferee is a party, is the possibility that he, by the use of other funds, may have cleared the property from the lien of a just debt, and may have made other expenditures for which he might properly claim a credit, subject, possibly, to an offset for the reasonable value of his use and occupation of the property. (See *Puccetti* v. *Girola, supra,* 63 Cal.App.2d 240, 249-251.)

The judgment awards respondent $20,000, as the reasonable value of the services of his attorneys in the trial of the action, and directs that this be paid by Lawler, as trustee, "out of any of said real and personal property and moneys recovered and received by him from said Bennett & Armour in pursuance of the terms of this judgment." That means $20,000 in addition to the amount necessary to satisfy respondent's claim.

By what authority was this award made? We have found none. "Except as attorney's fees are specifically provided for by statute, the measure and mode of compensation of attorneys . . . is left to the agreement, express or implied, of the parties . . ." (Code Civ. Proc., § 1021.) We have found no statutory exception applicable to this proceeding. There is an exception, in equity, that when by his action a plaintiff preserves or recovers a fund in which others are interested, all who benefit should share the expense, including the payment of a reasonable attorney's fee in prosecuting the action, conveniently and properly payable out of the fund. That principle might be applicable here if other creditors had intervened and it appeared, after trial and adjudication, that the just claims of the creditors equaled or exceeded the proceeds of the sale of the assets involved and that appellant had no right to share in any of those proceeds. But that, obviously, is not this case.

In *Miller* v. *Kehoe,* 107 Cal. 340, *supra,* at 343-345, in a creditor's action to set aside a fraudulent transfer, the court held it improper to allow such fees, for if allowed they would come out of the residue. The court distinguished the earlier case of *Patrick* v. *Montader,* 13 Cal. 434, in which there was no residue. This principle has been consistently adhered to. (See *Estate of Marré,* 18 Cal.2d 191 [114 P.2d 591]; *Los Angeles Trust & Sav. Bank* v. *Ward,* 197 Cal. 103 [239 P. 847].) In *Farmers & Merchants Nat. Bank* v. *Peterson,* 5 Cal. 2d 601 [55 P.2d 867], an action for an accounting from trustees under an assignment for the benefit of creditors, when approving an allowance of fees for plaintiff's attorney, out of the fund, the court was careful to observe that such allowance did "not increase the amount of the recovery against the defendants nor subject them to payment of the plaintiff's attorney's fee" (p. 607).

The judgment confirms and continues in effect, during the further pendency of the action, an order theretofore made appointing a receiver to take possession of the business and assets of appellant and to continue and manage that business as a going concern. This the court did in the exercise of powers recognized by statute (Code Civ. Proc., § 564, subds. 1, 7; Civ. Code, § 3439.11), powers of a court of equity when, in such a proceeding as this, the court. finds it necessary and desirable to appoint a receiver to preserve and conserve the property which is the subject matter of the suit. (See cases cited in 12 Cal. Jur. 1031-1032, § 72.) Appellant has directed

our attention to no factor which tends to indicate that in providing for this receivership the court abused the sound discretion vested in it, nor have we found any such factor in the record.

We next have to consider appellant's claim that certain orders, and the findings of fact, conclusions of law, and judgment, are void because, assertedly, made during the period of the suspension from practice of its sole attorney in the action, and no notice was given nor demand made upon appellant to appoint another attorney, as required by section 286, Code of Civil Procedure. The orders were those of May 12, 1949, appointing the receiver, and of June 14, 1949, permitting an amendment of the complaint to conform with the proof and to add John Lawler, in his capacity of assignee for the benefit of creditors, as a party defendant thereto. There is a conflict in the evidence on the question whether or not the suspended attorney was appellant's sole attorney in the action during the period of the suspension. We have examined the record, including affidavits considered upon the hearing, after the expiration of the suspension, of motions by appellant to set aside and strike out those orders, the findings of fact, the conclusions of law, and judgment. A superior court judge other than the judge who made the questioned orders, findings, conclusions and judgment heard those motions and denied them by an order dated August 20, 1949. The evidence supports the implied finding of that judge that during the period of the suspension appellant had and was represented by other attorneys who were not under suspension. Accordingly, we deem the point under discussion not well taken.

This brings us to the question: are the other creditors of Bennett & Layton privileged to come in, prove their claims, and participate in such further proceedings in this action as may be appropriate? If so, upon what theory may they be accorded that opportunity and in what manner may it be extended to them?

Our analysis leads us to the conclusion that this is a representative or class suit which the respondent Heffernan brought for his own benefit and for the benefit of all other creditors of Bennett & Layton. The issue common to all of the creditors is whether or not the questioned transfers were made with intent to defraud creditors of Bennett & Layton. That issue has been determined in favor of Heffernan and the other creditors, the persons whom he represents upon that issue. It is now in order for the trial court to provide for

active participation of the absentee creditors (the unnamed members of this class) by causing appropriate notice to be given them to come in seasonably, file their claims, and establish their rights. The court will accord the appellant in this action an opportunity to file objections to any of the claims of any of such other creditors, and will hear and determine the issues. ▮ The fraudulently transferred property is in the custody of the court, which has the power to order its sale and distribute the proceeds to the several parties in accordance with their respective rights as determined by the court, all in accordance with long established principles of equity. ▮ The appellant and the respondent will, of course, be bound by the judgment rendered, when it becomes final. So, also, will the creditors be bound who come in and present their claims or who, after due notice, fail to do so, as indicated in *Towle* v. *Donnell* (9th Circ.), 49 F.2d 49, at 51. In this, we are not directing the trial court as to the specific manner in which it will administer the details of such further proceedings, whether directly by the court or in part through the medium of a reference or a receivership. The determination of such matters lies within the sound discretion of the trial judge as chancellor in equity, acting in accordance with the applicable substantive principles and procedural requirements of equity as they obtain in this state.

▮▮ ''The propriety of representative or class suits has long been recognized in our statutory law as embraced in section 382 of the Code of Civil Procedure, enacted in 1872 and which provides as follows: 'Of the parties to the action, those who are united in interest must be joined as plaintiffs or defendants; . . . and *when the question is one of a common or general interest, of many persons, or when the parties are numerous, and it is impracticable to bring them all before the court, one or more may sue or defend for the benefit of all.*' (Italics added.) The italicized portion of this statute is based upon the doctrine of virtual representation, which, as an exception to the general rule of compulsory joinder of all interested parties, 'rests upon considerations of necessity and paramount convenience, and was adopted to prevent a failure of justice.' (*Bernhard* v. *Wall,* 184 Cal. 612, 629 [194 P. 1040]; 20 Cal.Jur., § 7, p. 483.) Even before the cited statute, as plaintiffs note, this doctrine found expression in this state in such cases as *Von Schmidt* v. *Huntington,* 1 Cal. 55, and *Gorman* v. *Russell,* 14 Cal. 531, each of which concerned the dissolution of a joint association and the distribution of the

company assets, with common interests in a common fund permitting representative or class disposition of the issues before the court in conformity with general principles of equity responsive to the exigencies of the situation showing that it was impracticable to require the joinder of all the numerous members 'interested in the subject matter' of the proceeding, and that their nonparticipation therein would not affect the full protection of their substantial rights. (Pomeroy, Code Remedies (5th ed.), § 292, p. 444.) While the cited statute—typifying the usual provision adopted in the various states—thus reenacts the long-prevailing equity rule, it applies both to legal and to equitable causes of action, since no restriction or limitation is contained in its language. [Citations, including Pomeroy's Code Remedies (5th ed.), § 290.]" (*Weaver* v. *Pasadena Tournament of Roses Assn.*, 32 Cal.2d 833, 836 and 837 [198 P.2d 514].) ▆ Regardless of which of the alternative conditions of the statute is invoked as authorizing a class proceeding, "it has been uniformly held that there must be a well-defined 'community of interest' in the questions of law and fact involved as affecting the parties to be represented. (Pomeroy, Code Remedies (5th ed.), § 286, p. 436; *Noroian* v. *Bennett*, 179 Cal. 806, 809 [179 P. 158]; *Batman* v. *Louisville Gas & Elec. Co.*, 187 Ky. 659 [220 S.W. 318, 319]; notes, 114 A.L.R. 1015; see, also, Blume, The 'Common Questions' Principle in the Code, Provisions for Representative Suits, 30 Mich.L.Rev. 878." (32 Cal.2d at 837 and 838.) ▆ "In general, a representative suit is proper because it is in behalf of a common or joint interest of an *ascertained class* in the subject-matter of the controversy": illustrated by the citation of six California cases described respectively as "a suit by one creditor for an accounting on a trust fund held under an assignment for the benefit of all creditors of the company," "an equitable proceeding by some of the stockholders and beneficiaries of a voting trust agreement to remove the trustees," "an attempt to impress a trust upon certain property in behalf of ascertainable beneficiaries," "litigation by a court-appointed liquidator to 'settle certain questions common to all of the subscribers' of a 'reciprocal or interinsurance exchange'," "an action involving the management of trust property on behalf of 'approximately three thousand unit holders' constituting the owners of the beneficial interests therein," and "a foreclosure proceeding on behalf of plaintiff and other bondholders." (32 Cal.2d at 839.) This enumeration does

not include the specific type of action involved upon the appeal before us, but we do not infer that the enumeration was intended to cover all types of action which might come within the principle.

Significantly, the court in the Weaver case held that the class suit is not confined to those cases in which all the unnamed members of the class are necessary parties. (32 Cal.2d at p. 841 and 842.) That is our type of case. Blume, in 30 Mich.Law.Rev. 878, cited in the Weaver case, says (at pp. 880 and 881) that when the object of a suit is to reach assets in the hands of a trustee who holds for the benefit of all the creditors the suit must be one by all or by one or more for the benefit of all, but that when the objective is that of setting aside a fraudulent conveyance of the common debtor joinder of all the creditors is not required; i.e., one may sue alone, two or more may join, or one or more may sue for the benefit of all. In support of the latter statement, Blume cites *Edmeston* v. *Lyde* (1829), 1 Paige Ch. (N.Y.) 637 [19 Am. Dec. 454], and *Hammond* v. *Hudson River Iron & Machine Co.* (1855), 20 Barb. (N.Y.) 378. In the Edmeston case certain judgment creditors had joined as plaintiffs. In overruling an objection that the other judgment creditors were necessary parties, the court said that a judgment creditor might sue ''either in his own name and for his own benefit, or might join with others standing in the same situation in a joint suit for their joint benefit . . . or . . ., in the usual way, in behalf of himself and all others standing in the same situation . . . and who might choose to come in under the decree and contribute to the expenses of the suit.'' [1 Paige at p. 638.] In the Hammond case, the court, overruling a like objection, said ''The creditor may commence the action for his own benefit, or in behalf of himself and all others in the same situation with himself who may choose to come in and contribute to the expenses of the suit.'' (20 Barb. at 381.)

Also, Pomeroy in section 291 of his Code Remedies, 5th edition, gives particular instances of the class suit. He states that one judgment creditor may sue, on his own behalf and on behalf of all other creditors similarly situated, to set aside a fraudulent conveyance, in view of their common interest in the question to be determined. This section of Pomeroy immediately follows a section (290) cited in the Weaver case in support of the statement that our code section ''reenacts the long-prevailing equity rule'' and applies it both to legal and equitable causes of action.

Pomeroy in turn, in his section 291, cites Story on Equity Pleadings, sections 99-103. Story supports the statements made by Pomeroy. (See Story, Equity Pleading, 5th ed., 1852, sections 99 and 286.) Story states, also, that under equity practice, the other creditors could come in and prove their debts before a master, to whom the cause was referred, and obtain satisfaction of their demands equally with the plaintiffs of record. Under such circumstances they were treated as parties to the suit. If they decided to come in they would be bound by the acts done under authority of the court. (Section 99.) In one of the cases cited by Story the court said, "It is an ordinary case in this Court, for creditors to unite, or for one or more, on behalf of themselves, or the rest to sue the representative of their debtor, in possession of the assets, and to seek an account of the estate." (*Brinkerhoff* v. *Brown* (1822), 6 Johns. Ch. (N.Y.) 139, 150, 151.) In another case cited by Story, the court observed that "One creditor may undoubtedly file a bill, in many cases, in behalf of himself and all the others" citing an English case. (*Hendricks* v. *Robinson* (1816), 2 Johns. Ch. (N.Y.) 283 at 296.)

The seeming paucity, in California, of class suits by creditors of a common debtor to set aside a conveyance made by him in fraud of creditors, is explained, perhaps, by the fact that until its repeal in 1939 section 3441 of the Civil Code permitted a creditor to avoid such a conveyance only when the fraud obstructed the enforcement, by legal process, of his right to take the property. That, naturally, meant that in most instances, the creditor would have to reduce his debt to judgment. By that time he had other, more convenient remedies for reaching the property. There were some exceptions to the requirement of a judgment as a condition precedent to setting the conveyance aside. (See 12 Cal.Jur. 1035, § 75.) *Miller* v. *Kehoe,* 107 Cal. 340 [40 P. 485], illustrates one of the exceptions. There three creditors of the common debtor brought an action to set aside a conveyance made in fraud of creditors. They had not reduced their claims to judgment and were now prevented from doing so because of a proceeding in insolvency which the debtor had commenced. They alleged that they brought the action on their own behalf and on behalf of all other creditors. Some of those creditors did come in. The court found that the conveyance was made with intent to defraud, set the conveyance aside, ordered the property sold, and directed distribution of the proceeds among the creditors in accordance with their respective rights, the

residue, if any, to go to the transferee. In these respects the judgment was affirmed. The Miller case is persuasive of the view that the instant case is a representative or class suit, even though it does not appear (from the printed report of the Miller case) precisely at what stage of the proceedings, or in what manner, some of the other creditors came in and presented their claims.

*Noroian* v. *Bennett*, 179 Cal. 806 [179 P. 158], is persuasive of the same view. There several makers of their respective promissory notes (each note, as it happened, was given to the same person as payee) joined as plaintiffs in a complaint against the payee, to set the several notes aside on the ground they were procured by fraud. The court held that these several makers could not join their several causes in the same action. There was no community of interest among them. In so holding, the court mentioned, by way of contrast, a number of types of cases in which there is such an interest, including the case "where a single fraudulent conveyance operates to the injury of several separate judgment creditors in the collection of their judgments, in each of which cases a single fact is the sole subject of the inquiry. . . ." (P. 809.) While that was not a discussion of the class suit (instead, the propriety of the joinder of the plaintiffs who commenced the suit) it was a discussion of the concept of "a community of interest" and was later cited, by the same court, following the statement that "it has been uniformly held that there must be a well-defined 'community of interest' in the questions of law and fact involved as affecting the parties to be represented." (*Weaver* v. *Pasadena Tournament of Roses Assn.*, *supra,* 32 Cal.2d 833, 837.) We do not think that the repeal of section 3441 of the Civil Code (subsequent to the decision in the Noroian case) takes from the statement made in that case, concerning the creditors' suit, any of its force or effect. The "community of interest" of defrauded creditors is the same whether their claims have been reduced to judgment or not.

The "common interest," the "community of interest," which respondent Heffernan and the other creditors had at the very commencement of this action, and still have, inheres in the issue presented by their claim that the questioned transfers were made with intent to defraud creditors. If that claim be established, it follows that the transfers were "void against all creditors of the debtor" at the time the transfers were made. (Civ. Code, § 3439, as it read at that time.)

It happens that that issue has been decided in favor of Heffernan and the other creditors. It further appears that that issue was the principal issue in the case, viewed in the light of the time and attention given it, overshadowing all other issues. Of the 1,961 pages of the reporter's transcript (exclusive of oral argument at the conclusion of the trial) a conservative estimate indicates that approximately 1,600 pages record evidence and argument upon this issue alone. Of the 105 exhibits introduced by the parties, about 90 to 95 appear to bear solely upon this issue. Respondent notes in one of his briefs that the creditors number 97. One of the exhibits tends to support that statement, indicating that as of December 30, 1942, the general creditors numbered 95. This poses the very practical question: Does equity require that each of the creditors other than Heffernan bring a separate suit to try this very same issue, between him and appellant Bennett & Armour? It is appalling to contemplate that such could or would be required. The burden it would impose upon each of the other creditors, the multiple burden it would impose upon Bennett & Armour, the time of the courts it would wastefully consume, the huge cost it would entail, and the long delay in consummating a final determination of this issue between the numerous parties which would ensue, all demand some form of judicial remedy that will avoid such untoward results and at the same time accord justice to all. That remedy is furnished by means of the representative or class suit, developed by equity long years ago and still recognized in this state even though not frequently invoked in a creditors' suit to set aside a conveyance made by a debtor in fraud of his creditors.

It is not enough, of course, that the conditions warranting a class suit exist, for a plaintiff to insist that he represents the other creditors. He must allege the facts upon which he bases his claim that he does represent the other members of his class. This the respondent Heffernan has done. In his complaint he stated that as of the date of the asserted fraudulent conveyance, the debtor had many unpaid creditors; that subsequent to the debtor's cessation of business in June 1940, all other available assets of the debtor have been liquidated and the proceeds apportioned among the creditors; that there are now no funds or properties belonging to the debtor available to its creditors except the property conveyed in fraud of creditors; that this action is brought and prosecuted by Heffernan for his own benefit and for the benefit of

all creditors of Bennett & Layton who may intervene and share the expense of the litigation; and, in the prayer of the complaint, he asked that these transfers be adjudged fraudulent and void as against Heffernan and the other creditors, that they be annulled and set aside for the benefit of the creditors, including Heffernan, and that a pro rata distribution of the funds and properties recovered in this action be made to the creditors.

It would be premature, at this stage, for us to undertake to determine as of what date (the date of the filing of this action or some later date) the issue of laches or of the bar of the statute of limitations, concerning the claim of any of the other creditors who later comes in, should be determined.* Such an issue will not arise if none of those creditors comes in or if no party to the action objects to any creditor's claim on such a ground. Besides, the creditor against whose claim such an objection is made, will be entitled to his day in court on that issue and should not be hampered or embarrassed by the utterance of a dictum on that subject at this time. In this connection, it is desirable to note that we are reversing that portion of the judgment which declares that the questioned transfers *"are* . . . void and of no effect as against . . . *all* other creditors . . . and are hereby cancelled, and set aside [as to such other creditors] with like effect as if they had never been made." (Italics added.) The quoted portion is too broad in its sweep. If allowed to stand and become final it well might preclude the appellant from questioning the diligence of any of such other creditors in the pursuit of his remedy to set the transfers aside and participate in the distribution of the proceeds. In addition, it is important to observe that nothing said in this opinion precludes any creditor, including Heffernan, from interposing any objection he may have to the claim of any creditor who later comes in to establish his rights. In making this reservation, we have in mind the possibility that some yet unnamed creditor may assert a claim that in some respect is adverse to those of his fellow creditors. Finally, we note that there are precedents to the effect that even if the plaintiff of record brings the action solely for his own benefit, the court has authority to order that the other creditors be notified and given an oppor-

---

*For discussion of such questions, see *Graham* v. *California Distilling etc. Co.,* 49 Cal.App.2d 522 [122 P.2d 88]; *Tubbs* v. *Delillo,* 19 Cal.App. 612 [127 P. 514]; *Mars* v. *McKay,* 14 Cal. 127; and notes in L.R.A. 1917D 885, and 14 A.L.R.2d 598, 8 A.L.R.2d 6, 166 A.L.R. 767, 128 A.L.R. 1289, 76 A.L.R. 864.

tunity to come in and present their claims, if the court deem that meet and proper. (See 1 Glenn, Fraudulent Conveyances and Preferences, rev. ed., 161-164, § 93; 15 C.J. 1413, "Creditors" Suits, § 112, n. 15; and cases there cited.)

From what has been said, it is apparent that the findings of fact, conclusions of law, and judgment, insofar as they find and declare that the questioned transaction was entered into with actual intent to defraud existing and future creditors and is void as to respondent, are correct and amply supported by the evidence and the law, and should be affirmed. This is equally true of those portions of the findings, conclusions of law, and judgment which relate to the appointment of the receiver and the allowance of costs other than attorney's fees. The balance of the judgment is erroneous and must be reversed.

It is therefore ordered that the judgment be reversed, with directions that the trial court revise the findings of fact and conclusions of law, take such further steps and proceedings in the action as may be meet and proper, and render judgment, all in accordance with the views herein expressed.

The appeals from the order of June 14, 1949, permitting an amendment to the complaint, and from that portion of the order of August 20, 1949, which denied a motion to vacate the order of June 14, are dismissed, for the reason that they were taken from nonappealable orders.

The remaining portion of the order of August 20, 1949, and the order of May 12, 1949, appointing the receiver, are affirmed.

Each party shall bear his own costs upon this appeal.

Peters, P. J., and Bray, J., concurred.

A petition for a rehearing was denied May 29, 1952, and appellant's and respondents' petitions for a hearing by the Supreme Court were denied June 26, 1952. Carter, J., was of the opinion that the petition should be granted.