[Civ. No. 20438. First Dist., Div. One. Apr. 9, 1963.]

T W M HOMES, INC., Plaintiff and Appellant, v. ATHER-
WOOD REALTY & INVESTMENT COMPANY, INC.,
et al., Defendants and Respondents.

Sheldon D. Durham for Plaintiff and Appellant.

Roy W. Seagraves, Norman G. Meadows and Robert O. Wilhelm for Defendants and Respondents.

SULLIVAN, J.—This is an action brought against Atherwood Realty & Investment Company, Inc. (hereinafter called Atherwood), and four individuals who were its directors and shareholders, to recover the reasonable value of building materials furnished by the plaintiff and to set aside allegedly fraudulent conveyances made by Atherwood to the other de-

fendants. Atherwood's default was entered prior to the case being called for trial. After a nonjury trial, the court below rendered judgment in favor of the plaintiff and against Atherwood for $5,950.41 principal, $2,000 attorneys' fees and costs but denied plaintiff all recovery against the individual defendants. Plaintiff appeals from those portions of the judgment unfavorable to it.

Plaintiff's seven-count amended complaint on which the case proceeded to trial may be summarized as follows: *Count one* sought recovery from all defendants of $2,852.31 for building materials furnished to be used, and thereafter used, in the construction of a dwelling on a certain parcel of real property owned by the defendants, $1,000 attorney's fees and the foreclosure of a lien for such sums. *Count two* sought recovery of $3,098.10 for materials similarly furnished and used in the construction of a dwelling on another parcel of real property owned by the defendants, $1,000 attorney's fees and foreclosure. It is convenient to observe here that recovery was granted plaintiff on the first two counts against Atherwood only, the court finding that such corporate defendant was the sole owner of the two parcels of property involved therein. Because of the foreclosure prior to trial of liens senior to the materialmen's liens, plaintiff presumably did not request and the judgment did not include provision for foreclosure of plaintiff's liens. *Count three* sought to set aside conveyances of four parcels of real property made on August 10, 1959, by Atherwood to the defendants Leon O. Balch and Jeanne M. Balch on the alleged grounds that, Atherwood being then insolvent, such conveyances were fraudulent in that they were made (a) without any fair consideration and (b) with the intent to hinder, delay and defraud creditors. Said count also alleges that at the time the conveyances were made "and at all times material herein," the defendants Balch had notice and knowledge of Atherwood's fraudulent intent. *Count four* sought upon the same grounds the same relief as count three in respect to a conveyance of a parcel of real property allegedly made on July 20, 1959, by Atherwood to the defendants James C. Voiss and Lynn S. Voiss. For convenience we will refer to the property as the Page Street property. *Count five* sought, upon the same grounds, the same relief as counts three and four in respect to a conveyance of a parcel of real property allegedly made on August 28, 1959,

by Atherwood to the defendants James C. Voiss and Lynn S. Voiss. For convenience we will refer to this property as either the Woodside property or the Bardet Road property.[1] *Count six,* incorporating by reference all of the allegations of counts one and two, alleged in substance that Atherwood was the *alter ego* of the four individual defendants and that said corporation was used by them as an instrumentality to conduct their personal business and ''to effect a fraud upon their creditors and the creditors of said corporation.'' *Count seven,* incorporating by reference all of the allegations of the first four counts, alleged that the four individual defendants, as directors and shareholders of Atherwood, ''authorized and ratified the conveyances of property'' set forth in counts three and four, that the plaintiff was a creditor of Atherwood at the time such conveyances were made and that the value of the property conveyed exceeded plaintiff's claim against Atherwood. In substance, this count sought to impose liability on the individual defendants for an allegedly unlawful distribution of corporate assets to shareholders.

We set forth the pertinent facts. Atherwood was incorporated in California on March 17, 1958. The defendants Balch, husband and wife, and the defendants Voiss, husband and wife, were its incorporators and appointed in its articles of incorporation to act as the first directors. At the first meeting of directors held on April 3, 1958, Balch was elected president; Mrs. Balch, vice president; and Mrs. Voiss, secretary-treasurer. The defendants remained as such directors and officers until August 12, 1959, when the resignations of Mr. and Mrs. Balch from all offices were accepted, two new directors were elected to fill their vacancies, and Voiss was elected president. Mrs. Voiss continued as director and secretary-treasurer.

Atherwood's authorized capitalization was $25,000, consisting of 250 shares at a par value of $100. On October 24, 1958, the Commissioner of Corporations issued its permit authorizing the sale of 20 shares at par for cash to the defendants Leon Balch and James Voiss, subject to the usual condition that the certificates when issued were to be deposited with an approved escrow holder. Ten shares were issued

[1] Neither of the parcels of property covered by the first two counts is involved in the alleged fraudulent conveyances set forth in the third, fourth, and fifth counts.

to each of the above persons. Each of them paid the corporation $1,000, which was obtained through a joint personal loan at a bank. Monthly payments on this loan were made by the corporation out of its own funds. Voiss, however, testified that such payments were "charged on our salaries and . . . carried in our salary account. . . ." Balch gave similar testimony.

At the outset, Atherwood's operations were those of a real estate broker, Balch and Voiss acting as salesmen and receiving their compensation from the corporation in the form of commissions. Beginning in July 1958, Atherwood began to acquire real property and to engage in the business of developing real estate and constructing homes. It continued in this business until September 1959. According to the testimony of Voiss, it became obvious "[i]n the late part of the summer" of 1959 that the corporation was in severe financial difficulties. In September the corporation endeavored to enter into some working arrangements with its creditors and eventually ceased operating altogether. An assignment for the benefit of creditors authorized in September was made by Atherwood on November 11, 1959. Because of the lack of cooperation on the part of all creditors, such assignment never became effective. Finally on March 9, 1960, Atherwood filed its petition to be adjudicated a bankrupt. The schedules filed therewith listed debts in the sum of $272,603.81 secured by real property valued at $191,450 and unsecured debts in the sum of $86,374.27.

Atherwood appears to have entered the second phase of its operations on a gradual basis and with extremely limited resources. Beginning in July 1958 it acquired over a period of several months some 30 to 34 lots upon which it proposed to build homes. Although Voiss testified that in some instances the corporation used its own funds to make a deposit on the purchase of such parcels of land, in most cases the property was acquired by an arrangement under which the seller took back a note and deed of trust for the selling price, at the same time agreeing to subordinate such security to any construction loan which Atherwood would place on the property in order to improve it. It is a fair reading of the record that Atherwood was conducting its operations mainly on such borrowed capital and that, while so engaged, virtually its only income consisted of the proceeds of construction loans obtained by it in order to build homes on

the parcels of real property thus acquired. The corporate books disclose that proceeds of construction loans were first received by Atherwood in October 1958 but that no proceeds from the sale of any completed houses were received until the summer of 1959. The corporation maintained one bank account in which all construction loan proceeds were deposited and from which all construction costs were disbursed.

Among the lots which Atherwood acquired in the fall of 1958 were two lots located in Woodside upon which the individual defendants contemplated building homes for themselves. The lot for Mr. and Mrs. Balch's home cost $10,000. The seller of the lot was paid $2,000 as a downpayment and took back (presumably from Atherwood) a note and deed of trust for $8,000 (presumably subordinated to the construction loan). Atherwood obtained a $23,000 construction loan on the property and it was from such proceeds that it paid the seller of the lot the above downpayment. There was testimony from an official of the lending agency making the construction loan on the Woodside property for Voiss that he suggested to Mr. and Mrs. Voiss that the home be thus financed through the corporation and that the parties assume the loan after the house was completed. The lot for Mr. and Mrs. Voiss' home cost $5,000. Voiss testified that he and his wife made the downpayment of $1,600 on the lot (more probably $1,500 and $100 closing costs). For the balance of the purchase price the sellers of the lot took back from Atherwood its note for $3,500 secured by a deed of trust.

At a meeting of the board of directors of Atherwood held on December 17, 1958, said directors being solely the four individual defendants herein, a resolution was passed to the effect that upon completion of Mr. and Mrs. Balch's home, the property be deeded to said parties "with no payment whatsoever to this corporation other than assuming the total indebtedness against the property." As we shall point out, this property was finally conveyed to Mr. and Mrs. Balch on August 10, 1959, along with three other parcels at the time Mr. and Mrs. Balch resigned as directors and officers. (Subject of count three.) At the same meeting, a separate resolution approved a deed theretofore executed by the corporation on December 16, 1958, in favor of Mr. and Mrs. Voiss and covering the Woodside lot on which their home was to be constructed. This deed was deposited in escrow with a local title company under instructions to deliver "without demand

on part of grantor'' and upon the instructions of Mr. and Mrs. Voiss. It was not placed of record until August 28, 1959.[2] This transaction is the subject of count five.

There is evidence that construction costs for the Balch home were in excess of $27,000 and that after deducting the down-payment on the lot and certain loan and title expenses, there was actually only $18,000 or $19,000 available out of a construction loan of $23,000 to apply to the above costs. There was also evidence that the Voiss home cost in excess of $34,000 and that after certain loan and title expenses, only a little over $26,000 was available out of a $27,000 construction loan to pay such costs. On the other hand, Voiss testified that it was anticipated that the Balch house would cost considerably less than $23,000, but that if there was any difference it was understood that the ''difference would be made up'' so that it would be at no cost to the corporation. Balch's testimony was to the same effect. He stated that the projected construction costs were less than the construction loans taken out for each house. There was, according to Balch, an understanding between him and Voiss that each of them would take over his respective home when completed and ''assume the loans and liens against them. . . . If there was any overage, it would be part of the corporation.'' Balch denied personal knowledge of the fact that the homes actually cost more to construct than originally anticipated, testified in effect that his first knowledge of such fact was acquired at the trial, and that he was not familiar with the corporate books—''I knew nothing about these books.'' The record shows that the corporation spent approximately $1,900 for furniture and furnishings for the new Balch home. Balch testified that such expenditures were charged to his ''job number,'' and in his view came under the above-mentioned arrangement. ''At the time that the house was finished, I personally was going to take over all obligations on that piece of property, all the liens of record,

---

[2]By deed dated September 28, 1959, and recorded September 30, 1959, Mr. and Mrs. Voiss conveyed the Woodside (Bardet Road) property to Mrs. Voiss ''as her separate property.'' Voiss testified that this conveyance and two others made at the same time, including one covering the Page Street property (see footnote 3 *infra*) were made as part of a property settlement preliminary to an action for divorce which Mrs. Voiss filed in June 1960. At the time of the above conveyance of September 30, 1959, however, the parties were living together ''occasionally'' and had moved into the Woodside property. On the same date, Mrs. Voiss caused to be placed of record immediately after the above conveyance, a declaration of homestead covering the Woodside property.

which was the $23,000 first loan and $8,000 second loan, is $31,000, and I still felt, with the swimming pool and with the furniture, it would just about balance out the obligations I was taking over.'' However, Balch placed a value of $45,000 on the house when completed. This included a swimming pool which cost $3,900 but apparently was not originally included in the plans.

It is convenient at this point to take note of additional facts pertinent to the acquisition of the Voiss lot in Woodside. As stated above, it cost $5,000, of which Voiss paid $1,600 (including closing costs) and the corporation gave a $3,500 secured note for the balance. According to both Atherwood's records and Voiss' testimony, on August 4, 1959, approximately three weeks before the deed to the lot was recorded and one week before the resignations of the Balches, the corporation paid Mrs. Voiss $2,300. The testimony is without dispute that this sum represented repayment of the $1,600 and of an additional $700 of out-of-pocket expenses paid by Mrs. Voiss for the home. Mrs. Voiss explained the $700 as consisting of a $500 loan made by her to the corporation and the balance as closing costs, title fees and costs of plans. The final payment of the Voiss lot and the full discharge of the aforementioned $3,500 secured note were effectuated in September 1959 with corporation moneys by having such payment made directly out of an escrow established for a sale of another parcel of property and with the proceeds of such sale there available. Such payment did not appear on the corporate books. The net effect of the foregoing corporate disbursements was that the purchase price of the Voiss lot in Woodside was fully paid by the corporation.

Voiss testified that the sum of $3,669 used to pay the promissory note was actually charged to him on the corporate books and that such debt was offset at least in part by certain credits due him. It is not necessary for us to detail the lengthy and complicated supportive testimony and documents. We deem it sufficient to state that, according to Voiss, an Allis-Chalmers loader was purchased and entered on Atherwood's books as a corporation asset; that in fact the equipment was purchased by Balch and Voiss; that although the corporation maintained the loader and made the installment payments on the loan obtained to purchase it, the amounts thus paid by the corporation were offset by payments received from third persons for the use of the loader; and that such rental income

constituted offsetting credits in favor of Voiss against the $3,669 of corporate funds used for the final payment on the Voiss lot. Balch, however, gave testimony contradicting that of Voiss, asserting that the corporation, and not Voiss and Balch individually, owned the equipment in question. Thus the evidence was in conflict as to who was entitled to the revenue from the use of the loader.

Voiss' claim of offsetting credits arising out of the loader transaction amounted in effect to evidence that the corporation did not pay the balance of the purchase price on the Voiss lot. We deem it unnecessary to set forth the specific data involved. It is enough to say that, viewing the evidence in the light most favorable to the respondents, it shows that Voiss had some offsetting credits although the amounts thereof may not be too clearly ascertainable because of the inadequacy of the corporate records.

There was also conflicting evidence on the compensation payable and paid to both Balch and Voiss. Both men appeared to have devoted their full time to the corporation's business. The accountant for the corporation testified that during the period January 1, 1959, to September 30, 1959, Balch received $3,796.58 and Voiss $4,796.58 in "salaries and advances." Voiss testified that they constituted salaries, although he acknowledged that no income taxes were withheld nor other payroll taxes deducted therefrom. The minute book of the corporation, which with the other exhibits has been brought up on appeal, discloses that a corporate resolution adopted August 13, 1958, authorizing monthly salaries of $500 each to Balch and Voiss, was cancelled by a resolution adopted February 11, 1959, which latter resolution also states "[t]hat any and all funds received in the past and to be received in the future by James C. Voiss and/or Leon O. Balch from the corporation shall be considered as an advance on anticipated annual dividends." Considering the evidence under the familiar rules of review, it seems to us to support the inference that despite the above corporate minutes, both men during all of the period were working for the corporation on the basis that they would receive compensation in the form of salaries, even though such compensation may not have been regularly paid.

On July 2, 1959, Atherwood executed a deed to Mr. and Mrs. Voiss as grantees covering the so-called Page Street property (subject of count four). This deed was placed of record

at the request of a title company on July 20, 1959. Mr. and Mrs. Voiss, and Balch, all testified that this conveyance was made as a repayment of a loan in the amount of $2,000 made to Atherwood by Mrs. Voiss on June 26, 1959. The property was conveyed subject to an existing loan of slightly less than $9,700. Balch testified that the market value of the property was $12,700 "gross," if a broker were required to make the sale, but that since a broker was not involved, "what we figured we were selling the property to Mrs. Voiss for, was $12,000." Depending on how such testimony is construed, Mrs. Voiss acquired an equity of either $2,300 or $3,000 in consideration of the payment of her $2,000 loan to the corporation.[3]

On August 10, 1959, Atherwood conveyed by separate deeds to Mr. and Mrs. Balch four parcels of real property on which homes had been constructed. Included among them was the Woodside real property on which the Balch home had been constructed. All four deeds were recorded on August 10, 1959, at Balch's request. The evidence is uncontradicted that these conveyances were made pursuant to a certain written "Agreement Re Stock and Salary" entered into between Atherwood and Leon O. Balch on August 10, 1959, approved at a directors' meeting held on August 12, 1959, at which the resignations of Mr. and Mrs. Balch were also accepted. The above agreement recites that "certain salaries have been accrued and are presently due and payable to said Leon O. Balch" and that Atherwood "is desirous of purchasing the shares of capital stock owned by Leon O. Balch and . . . of compensating Leon O. Balch for accrued salaries." Under the agreement Atherwood agreed not only to convey to Balch the four parcels (subject to specified encumbrances) but in addition to "loan" Balch $1,000. Such amount had been already paid Balch on August 7, 1959, and charged to the capital stock account. The record before us does not disclose specifically what Balch's accrued and unpaid salary amounted to.

The agreement effectuated Balch's desire to sever all connections with the corporation. According to Voiss, the two men considered the equities in the four parcels thus conveyed to Balch "to be in excess of $15,000." Balch estimated that they were "probably eleven or twelve thousand dollars."

On September 30, 1959, Atherwood commenced an action

[3]By deed dated September 28, 1959, and recorded September 30, 1959, Mr. and Mrs. Voiss conveyed the Page Street property to Mrs. Voiss "as her separate property."

against Leon O. Balch for rescission of the contract entered into between said parties on August 10, 1959. The complaint introduced in evidence by appellant herein was verified by Voiss as president of Atherwood and contained, *inter alia,* the allegation that Atherwood "was in fact insolvent on August 10, 1959, and that the transfer of the assets of the corporation as aforesaid to Leon O. Balch has rendered . . . Atherwood . . . more insolvent and has greatly impaired the rights of the creditors of Atherwood. . . ." Balch filed a verified cross-complaint for damages against Atherwood and Mr. and Mrs. Voiss as cross-defendants. Such cross-complaint, also introduced in evidence by appellant herein, alleges *inter alia* that at all times mentioned in the above complaint and cross-complaint, Atherwood was the "alter ego and business conduit of the other cross-defendants," that Mr. and Mrs. Voiss were actually co-partners in business and that recognition of the separate entities of Atherwood on the one hand and the other cross-defendants on the other would promote injustice.

After the commencement of the aforementioned action and apparently because of the filing of *lis pendens* incidental thereto, Balch lost all four parcels of property as a result of foreclosure of the encumbrances thereon. He sold the furniture in the Balch house in order to raise money for living expenses.

Plaintiff T W M Homes, Inc., a manufacturer of prefabricated parts of homes and of other building materials, entered into the foregoing maze on July 20, 1959. Plaintiff's claims rest on two written contracts with Atherwood: the first dated July 20, 1959, to furnish materials for the property covered by count two; the second dated August 11, 1959, for the property covered by count one. Neither contract was fully performed because Atherwood stopped construction of the homes. Thereafter, plaintiff billed Atherwood only for the reasonable value of the materials delivered to the jobs and in the amounts set forth by us earlier in this opinion.

Evidence was introduced at the trial bearing upon the financial condition of Atherwood particularly from July 1959 until it finally ceased its operations. A balance sheet at April 30, 1959, introduced by defendants, showed a surplus of $41,125.23. Voiss testified that in the "latter part of July and the first part of August" he "became a little concerned" about not being able to meet bills; that "[w]e had been taking our discounts up to a very short time before that"; that he

thought this was a temporary condition; that "in the late part of the summer" it became obvious that Atherwood was in "severe financial difficulties"; and that in September Atherwood was definitely unable to pay its bills. The minutes of the regular directors' meeting held on August 12, 1959 (when the agreement with Balch was approved) state the president (Voiss, who had just been elected) "reported that the situation of the Corporation is at the present time not in the ready cash position and there are some difficulties at present of meeting credit obligations." The minutes of the special meeting of directors held on August 25, 1959, state: "There was made a full disclosure of the financial picture of the corporation, and the corporation discussed the possibility of a creditors meeting which was felt necessary for carrying on the general business of the corporation. Atherwood Realty appears to be insolvent at the moment." A general creditors' meeting was thereafter held on September 3, 1959. A "statement of financial condition" as of September 2, 1959, introduced by defendants, shows total accounts payable of $131,000 and total accounts receivable of $111,300, producing a deficit of $19,700.[4] Total fixed assets shown on such statement total only $5,500. Finally, defendants introduced a balance sheet at September 30, 1959, showing total current liabilities of $315,191.31, total liabilities (after accounts payable, officers) of $329,224.80, no current assets, and a deficit of "capital" in the sum of $31,-622.51. A statement of income and expenses, offered as part of the same exhibit, and covering the period March 1, 1959, to September 30, 1959, shows a net operating loss of $25,765.33, and, after taking into account two other items of income and expense, a net loss of $24,309.49.[5] We have set forth earlier the financial condition of the corporation at the time of filing its petition in bankruptcy.

We have already adverted to the court's findings on the first two counts. On the remaining counts, although finding that Atherwood owned and thereafter conveyed the four lots to Balch on the date alleged, the court generally found that all of the allegations therein contained were "untrue." Thus

---

[4] Atherwood's accountant testified that this statement was not prepared directly from the records, that "Mr. Voiss and myself worked together on it" and that it was the "best result" he could arrive at on the corporation's condition.

[5] The corporation's accountant testified that he prepared this financial statement and balance sheet as well as the balance sheet of April 30, 1959, without audit.

it was found untrue that on July 20, 1959, Atherwood owned and thereafter conveyed the Page Street property and that on August 28, 1959, Atherwood owned and thereafter conveyed the Woodside (Bardet Road) property, although the court found that the deed was recorded on such date. As a whole, the court found that none of the three conveyances were fraudulent either on the grounds that they were made with actual intent to defraud (Civ. Code, § 3439.07) or that they constituted conveyances made by an insolvent person without consideration (Civ. Code, § 3439.04); that Atherwood was not the *alter ego* of the individual defendants; and that in respect to count seven, the four individual defendants incurred no enforceable liability resulting from alleged unlawful distributions of corporate assets.

Appellant contends that there is no support in the evidence for any of the findings which are unfavorable to it. In addition, appellant claims that the evidence *required* findings and judgment in favor of appellant on all causes of action. On various points of the argument appellant has set forth evidence which, it is urged, must lead us to conclusions favorable to appellant and supportive of its basic position on the case. Much of the argument, we feel, would be more properly directed to the trier of fact. In view of the nature of such argument, it seems necessary to restate the familiar rules which govern our review. "As has so frequently been said, it is the general rule that on appeal an appellate court (1) will view the evidence in the light most favorable to the respondent; (2) will not weigh the evidence; (3) will indulge all intendments and reasonable inferences which favor sustaining the finding of the trier of fact; and (4) will not disturb the finding of the trier of fact if there is substantial evidence in the record in support thereof." (*Berniker* v. *Berniker* (1947) 30 Cal.2d 439, 444 [182 P.2d 557].) "When a finding of fact is attacked on the ground that there is not any substantial evidence to sustain it, the power of an appellate court *begins* and *ends* with the determination as to whether there is any substantial evidence contradicted or uncontradicted which will support the finding of fact." (*Primm* v. *Primm* (1956) 46 Cal.2d 690, 693 [299 P.2d 231]; original italics.)

*The allegedly fraudulent conveyances. (Counts three, four and five.)*

 In order to establish a conveyance as fraudulent

under section 3439.04 of the Civil Code, it must appear that the transferor is insolvent at the time of the conveyance or will be rendered insolvent thereby *and* that the conveyance was made without a fair consideration. (*Aggregates Associated, Inc.* v. *Packwood* (1962) 58 Cal.2d 580, 589 [25 Cal.Rptr. 545, 375 P.2d 425]; *Tokar* v. *Redman* (1956) 138 Cal.App.2d 350, 353-354 [291 P.2d 987].) █ Proof of insolvency and of want of fair consideration is therefore conclusive of fraudulent intent and *actual* intent to defraud on the part of the transferor is immaterial and need not be established. (See *Wight* v. *Rohlffs* (1941) 48 Cal.App.2d 696, 697 [121 P.2d 76]; *Enos* v. *Picacho Gold Min. Co.* (1943) 56 Cal.App.2d 765, 766 ]133 P.2d 663].) █ However, if the consideration is fair, the conveyance cannot be set aside under section 3439.04. (*Enos* v. *Picacho Gold Min. Co., supra.*)

█ A person is insolvent under the Uniform Fraudulent Conveyance Act (Civ. Code, §§ 3439.01 to 3439.13 inclusive) "when the present fair salable value of his assets is less than the amount that will be required to pay his probable liability on his existing debts as they become absolute and matured." (§ 3439.02, subd. (a).) Insolvency under the above statute thus means the insufficiency of the entire property and assets of an individual to pay his debts. (*Aggregates Associated, Inc.* v. *Packwood, supra.*)[6] Fair consideration is given for the property conveyed "[w]hen in exchange for such property . . . , as a fair equivalent therefor, and in good faith, property is conveyed or an antecedent debt is satisfied. . . ." (Civ. Code, § 3439.03, subd. (a).) █ Section 3439.04 provides protection for "creditors" and, unlike section 3439.07 dealing with actual intent to defraud, makes no express reference to "future creditors." We are of the opinion therefore that it protects only existing creditors and that the person invoking the section must establish that he was a creditor at the time of the conveyance. (See 4 Witkin, Summary of California Law, Equity, § 101, pp. 2877-2878, citing *Haller* v. *Haller* (1929) 102 Cal.App. 370 [283 P. 94] and analogizing to the similar rule under the predecessor statute.) █ On the other hand to establish a conveyance as fraudulent under section 3439.07[7] *actual* intent, as distin-

---

[6]This language also appears in *Estate of Boggs* (1942) 19 Cal.2d 324, 329 [121 P.2d 678], decided under former Civ. Code, § 3442.

[7]Section 3439.07 provides: "Every conveyance made and every obligation incurred with actual intent, as distinguished from intent presumed in law, to hinder, delay, or defraud either present or future creditors, is fraudulent as to both present and future creditors."

844

guished from intent *presumed* in law, to defraud creditors must be proved. ''While it is true that proof of fraud may, and must often be, made by circumstantial evidence [citation], it remains true that actual fraud must be proved by clear and convincing evidence [citation], and that 'where the circumstances of the transfer comport equally with the theory of honesty and fair dealing, fraud will not be found.' (*Hedden* v. *Waldeck*, 9 Cal.2d 631, 636 [72 P.2d 114].)'' (*Aggregates Associated, Inc.* v. *Packwood, supra,* 58 Cal.2d 580, 588.) In such cases, however, the solvency of the transferor is immaterial (*Fross* v. *Wotton* (1935) 3 Cal.2d 384, 389 [44 P.2d 350] quoting from *Hager* v. *Shindler* (1865) 29 Cal. 47, 59 to the effect that ''A rich man may make a fraudulent deed as well as one who is insolvent.'') By its express terms the above statute provides protection for ''both present and future creditors.''

(a) *Actual intent to defraud creditors. (Counts three, four and five.)*

At the outset we dispose of appellant's contention that ''the evidence as a whole required a finding that all the conveyances attacked were made with intent to defraud the creditors of the corporation, and that they thereby constituted fraudulent conveyances because of the existence of that element alone.'' Appellant argues that ''clear'' evidence establishes that at the times the various conveyances were made, Atherwood was insolvent and unable to meet its obligations. Additionally, it is argued, the conveyances ''were not made in the usual and ordinary course of its business.'' In effect, appellant's claim is that the evidence establishes actual fraudulent intent as a matter of law. Appellant's contention is entirely devoid of merit.

 Whether a conveyance is made with actual intent to defraud creditors is not a question of law but one of fact to be determined by the trial court. (*Knapp* v. *Elliott* (1947) 81 Cal.App.2d 667, 673 [184 P.2d 934]; *Arnold* v. *Hadgis* (1951) 102 Cal.App.2d 88, 93 [226 P.2d 641]; *Jackson* v. *Burke* (1954) 124 Cal.App.2d 519, 526 [269 P.2d 137]; *Slater* v. *Bielsky* (1960) 183 Cal.App.2d 523, 527 [6 Cal.Rptr. 683].) As this court stated in *Heffernan* v. *Bennett & Armour* (1952) 110 Cal.App.2d 564, 578-579 [243 P.2d 846], an actual intent to defraud ''never arises as a matter of law from the existence of any given set of facts. It must be proved just as any other material fact in issue. Its proof

is peculiarly dependent upon the circumstances which sur-
round the questioned transaction, and the inferences which
the trier of the facts may reasonably draw therefrom.''

In the instant case, the uncontradicted evidence relat-
ing to the conveyance of the Page Street parcel (count four)
was that it was made as a repayment of the $2,000 loan made
by Mrs. Voiss to Atherwood.; that the market value of the
property was $12,700; and that the equity therein acquired
by the Voisses was of the value of $3,000. There was evidence
pertinent to the conveyance of the four lots to the defendant
Balch (count three) that the latter was dissatisfied with the
corporation, desired to sever his connections with it and
surrendered his rights to accrued salary and his shares therein
in exchange for the conveyance under attack. There was also
evidence relating to the construction of the home for Balch
(included in the above conveyance) and the home for Voiss,
that the anticipated costs of construction would not exceed
the amount of the respective construction loans and that if such
costs were in excess thereof the difference was to be paid by
the person for whom the home was being built. On the
other hand, if construction costs were less than the loan which
each party intended to assume upon completion of the house,
the difference was to be kept by the corporation. Each party
testified that he anticipated costs as originally projected and
Balch denied all knowledge that his house actually cost more.

The trial court could have well concluded on the basis of
the foregoing evidence that the purpose of the corporation
in making the conveyances was not to defraud creditors but to
pay an obligation (Page Street), negotiate the retirement
of a shareholder (Balch lots) and build two homes for two
officers (Balch lot and Voiss lot) without cost to the corpora-
tion. It was within the exclusive province of the trial
court to weigh and evaluate all of the factors bearing upon
the issue of actual intent including the factor that all three
conveyances were made to officers and directors and the fact
that two of the deeds were not promptly placed of record. It
is not our proper function to reweigh the evidence relevant to
the three conveyances much less to declare that such evidence
establishes an actual intent to defraud as a matter of law.
(*Heffernan* v. *Bennett & Armour, supra,* 110 Cal.App.2d
564.) The trial court's determination that there was no actual
intent to defraud must therefore be upheld.

We turn to the question whether the court's finding that

the conveyances were not presumptively fraudulent is supported by the evidence.

(b) *Conveyance of Page Street parcel to defendants Voiss. (Count four.)*

There was no specific finding as to when the Page Street property was conveyed or as to its value at the time of conveyance. Respondent Voiss[8] asserts that it was conveyed on July 2, 1959, the date of the signing of the deed; appellant asserts it was conveyed on July 20, 1959, the date of recordation of the deed. While there is no evidence of the precise event of manual tradition of the deed, it is beyond dispute that the deed was in fact delivered. A duly signed and delivered deed is presumed to have been delivered at its date. (Civ. Code, § 1055; *Miller* v. *Jansen* (1943) 21 Cal.2d 473, 476 [132 P.2d 801]; *Blackburn* v. *Drake* (1963) 211 Cal.App.2d 806, 812 [27 Cal.Rptr. 651].) We find no evidence dispelling the above presumption. It is therefore our conclusion that the Page Street parcel was conveyed on July 2, 1959, and that the evidence in the record supports the trial court's negatively phrased finding that the conveyance did not occur on July 20, 1959.

In view of the fact that this plaintiff did not become a creditor of Atherwood until July 20, 1959, the date of its first contract, it follows that plaintiff was not an existing creditor on July 2, 1959 (Civ. Code, § 3439.01), and thus entitled to invoke the protective remedies of section 3439.04. It is therefore not necessary for us to determine whether there is evidence supporting the court's findings on the issues of insolvency and want of fair consideration inherent to section 3439.04. The evidence is sufficient to support the court's findings that the aforementioned conveyance did not offend against section 3439.04 of the Civil Code.

(c) *Conveyance of four lots to defendant Balch. (Count three.)*

The evidence was uncontradicted and the court found that the four lots were conveyed to Balch by Atherwood on August 10, 1959.[9] The court also found that the allegations that Atherwood was insolvent on said date and that the conveyance was made without any fair consideration were "untrue." If these

---

[8] I.e., respondent Lynn S. Voiss. James C. Voiss has filed no brief herein.

[9] Conveyances were made by separate deeds all executed and recorded on the same day. For convenience, we refer to these as one conveyance.

negatively phrased findings are expressed in terms of their positive equivalents, the court in effect found that Atherwood was solvent on August 10, 1959, and the conveyance on that date was made for a fair consideration.

There is no evidence in the record that on August 10, 1959, Atherwood was insolvent under the statutory definition (Civ. Code, § 3439.02) in that the fair salable value of its assets was insufficient to pay its then existing debts as they matured. (Cf. *Aggregates Associated, Inc.* v. *Packwood, supra,* 58 Cal. 2d 580; *Miller* v. *Keegan* (1949) 92 Cal.App.2d 846, 851 [207 P.2d 1073].) While there was testimony from Voiss referring to his concern about meeting bills in the latter part of July and the first part of August and a statement on the corporate minutes of the meeting of directors on August 12, 1959, indicating financial difficulties, no proof was offered as to the corporation's assets on the critical date of August 10, 1959. To render a conveyance fraudulent under Civil Code section 3439.04, the insolvency of the transferor must exist at the time of the conveyance or must result therefrom. (*Aggregates Associated, Inc.* v. *Packwood, supra,* 58 Cal.2d 580; *Miller* v. *Keegan, supra,* 92 Cal.App.2d 846, 851; *In re Liquimatic Systems, Inc.* (D.C.S.D. Cal. 1961) 194 F.Supp. 625, 628.) Neither a failure to meet credit obligations nor an inability to pay bills because of lack of ready cash is sufficient, standing alone, to warrant a conclusion of insolvency, nor is either circumstance necessarily inconsistent with solvency. (*Miller* v. *Keegan, supra.*) Since insolvency must exist at the time of the conveyance or must result therefrom, subsequent insolvency is not of itself a sufficient foundation for an inference of insolvency at the time of the conveyance. (*In re Liquimatic Systems, Inc., supra; Tainter* v. *Broderick Land & Inv. Co.* (1918) 177 Cal. 664, 666 [171 P. 679].) As the court said in *Miller* v. *Keegan, supra,* "[a]s a general rule 'solvency and not insolvency is presumed.' (*Hasenjeager* v. *Voth,* 91 Cal.App. 394, 397 [267 P. 146].) To overcome this presumption a fair interpretation of the statute requires some basis in evidence for determining that the amount of the debtor's obligations exceeded the then present fair salable value of his non-exempt assets." (92 Cal. App.2d at p. 852.)[10]

---

[10]In *Hasenjaeger* the quoted proposition is supported by citation to 1 Jones on Evidence (2d ed.) p. 425, thus indicating that the court's rationale rested upon the presumption of a continuance of the existing

 Appellant urges that evidence of Atherwood's insolvency is found in the complaint filed by Atherwood against Balch on September 30, 1959, which contained the allegation, that Atherwood was insolvent on August 10, 1959. Whatever probative value such allegation may have had in the court below as an evidentiary admission against Atherwood itself or the respondent James C. Voiss who verified the complaint (see Witkin, Cal.Evidence, § 224, p. 252), it was not an admission against Mr. and Mrs. Balch. As we have pointed out, the third cause of action herein sought to set aside the conveyance of the four lots to Mr. and Mrs. Balch and in such cause of action they were the principal defendants. The transferees, here Mr. and Mrs. Balch, are necessary parties defendant in an action to set aside a fraudulent conveyance. (*Heffernan* v. *Bennett & Armour, supra,* 110 Cal.App.2d 564, 586; *Liuzza* v. *Bell* (1940) 40 Cal.App.2d 417, 424 [104 P.2d 1095].) The transferor, here Atherwood, though a proper party defendant, is not a necessary one. (*Liuzza* v *Bell, supra.*)[11] It was incumbent upon appellant to prove the allegations of count three against the defendants Balch. Appellant may not rely upon the above admissions of Atherwood and Voiss in the complaint filed on September 30, 1959, any more than it may rely on Atherwood's admissions of the material allegations of appellant's amended complaint in the instant action implied from Atherwood's default which has been entered herein. (*Miller* v. *Keegan, supra.*)[12]

The trial court's finding of Atherwood's solvency can therefore be supported by the above presumption of solvency. This presumption was not dispelled by any evidence in the record. Indeed the record is bare of any evidence which would support a finding of insolvency on the critical date. Such being the case, it is not necessary for us to inquire whether the

state of things. (See 1 Jones on Evidence (5th ed.) § 66, p. 119, fn. 2; cf. Code Civ. Proc., § 1963, subd. 32.)

[11]Appellant's complaint does not particularize the defendants for each count. It is clear, however, that the respondents Voiss are not defendants in count three which attacks the conveyance to the Balches any more than the latter are defendants on counts four and five which attack conveyances to the Voisses. The corporate transferor was a proper party defendant on all of the above three counts.

[12]As part of the same exhibit in evidence, is Balch's answer to the complaint dated September 30, 1959, in which he denies all of the allegations thereof. An examination of the record convinces us that the court admitted these pleadings for a limited purpose and to show the contentions of the respective litigants in such action. It is clear to us that this did not result in an admission by Balch of Atherwood's insolvency.

court's finding that the conveyance was made for a fair consideration is supported by substantial evidence. We must uphold the court's determination that the conveyance was not presumptively fraudulent.

(d) *The conveyance of the Woodside parcel to the Voisses.*

The court found that the corporation's deed to Mr. and Mrs. Voiss covering this property was recorded on August 28, 1959, but found "untrue" the allegations that the property was conveyed on that date. Respondent Lynn Voiss takes the position that the property was conveyed on December 16, 1958, which indeed seems to have been the conclusion of the trial judge.[13] The opinion of the trial judge may be considered for the purpose of ascertaining the process of reasoning by which he arrived at his findings. (*Oldis* v. *La Societe Francaise* (1955) 130 Cal.App.2d 461, 474-476 [279 P.2d 184]; *Arvin-Kern Co.* v. *B. J. Service, Inc.* (1960) 178 Cal.App.2d 783, 793 [3 Cal.Rptr. 238].) While the court made a general finding that the conveyance under attack was not made on August 28, 1959, as asserted by appellant, it did not specifically find *when* the conveyance was made. However, the opinion of the trial judge makes clear his process of reasoning: the conveyance was not made on the date claimed because as the trial judge concluded in his opinion, it "was actually made in December, 1958."

 Appellant argues that subsequent to the execution of the deed the corporation "exercised acts of ownership over the property" by securing a construction loan in its name. It is also urged that the repayment to Mrs. Voiss on August 4, 1959, of the sum of $2,300 representing loans or advances made by her for the property is inconsistent with the theory that the Voisses owned the property and consistent with the theory that the corporation was the owner thereof until August 28, 1959, when the deed was recorded and according to appellant's claim, the conveyance effectuated. These circumstances however merely raised a conflict in the evidence, the resolution of which was within the exclusive province of the court below. (*Chaffee* v. *Sorensen* (1951) 107 Cal.App.2d 284, 288 [236 P.2d 851].) Appellant did not claim a conveyance

---

[13]In its memorandum opinion, the court states: "the conveyance was actually made in December, 1958; the legal requirement of delivery was met; recordation in August, 1959, did not affect the conveyance, except insofar as the failure to record was designed to and did fraudulently affect creditors; plaintiff was not a creditor at the time of conveyance, and Atherwood was not then insolvent."

of the property at any other time than on or about August 28, 1959. Indeed it concedes that the conveyance could be upheld as not presumptively fraudulent only on the ground that it was effective as of the date of execution of the deed rather than as of the date of its recordation. The court below found unfavorably to appellant on precisely this basis, namely, that there was no conveyance on August 28, 1959, because there was delivery of the deed on December 16, 1958. Substantial evidence supports this finding. As we pointed out in respect to the Page Street property (see authorities there cited) the deed being admittedly signed and delivered, it is presumed to have been delivered at its date. In addition, documentary evidence in the record shows its unconditional delivery to a local title company on the date it was signed.[14]

 Appellant also argues that, assuming title passed to the Voisses in December 1958, nevertheless the use of corporate funds to pay for the property constituted a violation of the Voiss' fiduciary duty to the corporation; that as a result the Voisses held such title in trust for the corporation (citing Civ. Code, § 2224) ; and that consequently at the time the deed was recorded, the corporation was still the owner of the property. This involved argument must fail. The evidence shows that the conveyance was made on December 16, 1958, by corporate resolution. Assuming circumstances constituting the Voisses constructive trustees, it is apparent that under the above statute Atherwood and not this appellant would be the person "who would otherwise have had" the property allegedly gained by violation of a trust and who would be entitled to seek to establish such trust.

We conclude therefore as follows: Appellant has failed to establish that it was an existing creditor at the time of the conveyance in question and is not entitled to invoke the protective remedies of section 3439.04. It is therefore unnecessary to discuss the evidence in its relation to the court's findings on the issues of insolvency and want of consideration. The trial court's refusal to set aside the conveyance as presumptively fraudulent must be upheld.

---

[14]Atherwood's instructions dated December 16, 1958, on the printed form of the title company state, *inter alia*: "We deliver herewith . . . [the deed and corporate resolution] which you are to deliver or record only according to the following instructions: Without demand on part of grantor and upon the instructions of James C. Voiss and Lynn Voiss. . . ." The deed itself shows recordation on August 28, 1959, "at request of" the same title company.

*The trial court's refusal to disregard Atherwood's corporate entity. (Count six.)*

The sixth count of the amended complaint alleged in substance that Atherwood was the *alter ego* of the individual defendants; that they used such corporation merely as an instrumentality for conducting their personal business; that they regularly confused and intermingled their personal business and assets with those of the corporation; and that they used the corporation as an instrumentality to effect a fraud upon their creditors and the creditors of the corporation. In a short general finding, the trial court found that all of the foregoing allegations were "untrue."

Appellant argues that the failure to validly issue stock and to provide for the adequate capitalization of Atherwood "when considered with all the other evidence regarding the individual respondents' handling of the affairs of the respondent corporation" *require* findings and judgment disregarding the corporate entity. As part of such "other evidence" appellant refers, *inter alia,* to the following: cash disbursements to the defendants claimed to be illegal dividends (Corp. Code, § 1500-1501) in the absence of a resolution authorizing salaries; disbursement of corporate funds for the construction of the Balch and Voiss homes; payment of the bank loan obtained by Balch and Voiss for the purchase price of the stock, which payments they claimed were charged to their salary accounts; disbursement of funds to purchase furniture for the Balch house; the purchase of the HD-5 loader later claimed as the personal asset of Balch and Voiss; and the transfers of the Page Street property, the four lots (including the lot with Balch's home) to Balch and Woodside lot and home to Voiss, previously discussed herein.

In *Associated Vendors, Inc.* v. *Oakland Meat Co.* (1962) 210 Cal.App.2d 825 [26 Cal.Rptr. 806], Mr. Justice Molinari, writing for this court, has set forth in an exhaustive treatment[15] of the subject, the rules governing the legal prob-

---

[15] *Associated Vendors, Inc.* cites and evaluates the following cases here relied upon by appellant: *Automotriz etc. De California* v. *Resnick* (1957) 47 Cal.2d 792 [306 P.2d 1]; *Temple* v. *Bodega Bay Fisheries, Inc.* (1960) 180 Cal.App.2d 279 [4 Cal.Rptr. 300]; *Pan Pacific Sash & Door Co.* v. *Greendale Park, Inc.* (1958) 166 Cal.App.2d 652 [333 P.2d 802]; *Claremont Press Pub. Co.* v. *Barksdale* (1960) 187 Cal.App.2d 813 [10 Cal.Rptr. 214]; *Shafford* v. *Otto Sales Co., Inc.* (1957) 149 Cal. App.2d 428 [308 P.2d 428]; *Marr* v. *Postal Union Life Ins. Co.* (1940) 40 Cal.App.2d 673 [105 P.2d 649].

lem of disregarding the corporate entity. He there said: "The basic rule stated by our Supreme Court as a guide in the application of this doctrine is as follows: The two requirements are (1) that there be such unity of interest and ownership that the separate personalities of the corporation and the individual no longer exist, and (2) that, if the acts are treated as those of the corporation alone, an inequitable result will follow. [Citations.]...

"The gist of the cases which have considered the doctrine is that *both* of these requirements must be found to exist before the corporate existence will be disregarded; that such determination is primarily one for the trial court and is not a question of law; and that the conclusion of the trier of fact will not be disturbed if it be supported by substantial evidence. [Citations.] It should also be noted that, while the doctrine does not depend on the presence of actual fraud, it is designed to prevent what would be fraud or injustice, if accomplished. Accordingly, bad faith in one form or another is an underlying consideration and will be found in some form or another in those cases wherein the trial court was justified in disregarding the corporate entity. [Citations.]" (210 Cal.App.2d pp. 838-839; original italics.)

As in the instant case, this court was presented in *Associated Vendors, Inc.* with the contention that certain evidence relied upon by the appellant in that case *required* that the corporate entity be disregarded. In rejecting such contention we observed that while the evidence thus relied upon *might* have supported a contrary finding, it did not *compel* one and that substantial evidence supported the finding that the separate personalities of both the corporation and the individuals connected with it continued to exist.

In the instant case it was within the province of the trial court to determine whether there was such unity of interest and ownership as to preclude separate existing personalities of Atherwood on the one hand and the four individual respondents on the other. The court found in effect that Atherwood's separate personality was preserved and therefore its corporate entity should not be disregarded. We cannot say that such a finding lacks substantial supporting evidence. The corporation maintained separate books and bank account, held corporate meetings and recorded the transactions and resolutions of the same in its minute book. In its land devel-

opment transactions, its activities were corporate in character. It acquired parcels of land, executed to the sellers its various promissory notes and deeds of trust to secure payment of the purchase price. It secured construction loans and upon receipt of the loan proceeds deposited the same in the corporate bank account. There is no evidence of commingling of corporate and individual funds in such bank account. The very contracts with plaintiff are executed by Atherwood in its corporate name. Mr. Tobey, an incorporator and former president of the plaintiff, who was called by the defense, testified that he participated in the negotiation of such contracts, that plaintiff's officers knew of Atherwood's financially weakened condition, were familiar with its methods of financing, decided to sell the prefabricated houses to Atherwood in order "to give them help" and even arranged for payment on a basis which would leave available to Atherwood some of the construction loan proceeds. The general tenor of this testimony is that plaintiff was looking to Atherwood rather than to the defendants for payment on these contracts. There was testimony from Mr. Webber, who was plaintiff's president at the time of the trial, that prior to the filing of the instant action no demand for payment was ever made on any person other than the corporate defendant. There is also considerable testimony that Atherwood's other creditors looked to it in its corporate capacity rather than to the individual defendants.

Appellant relies heavily on the claim that Atherwood was undercapitalized. However this factor and the evidence bearing upon it were merely circumstances to be considered by the trial court. We cannot hold that such evidence constituted undercapitalization as a matter of law or that such factor, if it did exist, requires as a matter of law that the corporate entity be disregarded. (*Associated Vendors, Inc.* v. *Oakland Meat Co., supra,* 210 Cal.App.2d 825, 841-842.)

The other claim which appellant emphasizes pertains to the issuance of the corporate stock. In essence, it amounts to this: The permit to issue stock dated October 24, 1958, required that the certificates be deposited with an escrow holder. However the certificates were issued on April 4, 1959, four days before the appointment of the escrow holder. No claim is made that the certificates were delivered to the shareholders themselves in violation of the permit or that they were not thereafter deposited in escrow as required by it. Appellant asserts that nothing was paid for the stock. However, the

court could well accept the testimony of the defendants that, although Atherwood made payments on the loan of ·$2,000 used by the defendants to buy the stock, such payments were charged against their salary accounts. All of the foregoing was merely evidence to be weighed by the trial court.

It is not necessary to discuss at length ''all the other evidence'' regarding respondents' handling of corporate affairs with which appellant invites us to consider the above two factors of alleged undercapitalization and improper issuance of the corporate stock. In the main this other evidence relates to the transactions pertaining to the real property the conveyances of which are herein attempted to be set aside. As we have pointed out, the court found that none of such conveyances were made with an actual intent to defraud. Such findings are of course relevant here. We must assume that the court considered all of the ''respondents' handling'' of the corporate affairs, evaluated such evidence and made the determination, as was its province, that there was no such unity of interest and ownership as to require the relief here sought.

*Alleged distribution of corporate assets.* (*Count seven.*)

The seventh count of the amended complaint incorporated by reference all of the allegations of counts one and two (pertaining to Atherwood's liability to the plaintiff) as well as of counts three and four (pertaining to the conveyances of the four lots to the Balches and of the Page Street property to the Voisses). By additional allegations it sought to fasten a personal liability on the individual defendants on the theory that the above conveyances constituted a distribution of a part of the corporate assets among the shareholders in violation of section 824 of the Corporations Code. Generally speaking, the trial court found that all of the allegations supporting such theory of recovery were untrue, except that the court did find that the value of the property conveyed exceeded the amount of plaintiff's claim against Atherwood.

Section 824 of the Corporations Code upon which plaintiff bases its claim provides that, except as specifically authorized in said code, the directors of a corporation shall not authorize or ratify the withdrawal or distribution of any part of the corporate assets among its shareholders.[16] In the event of any

---

[16]Corporations Code section 824 provides in relevant part: ''Except as provided in this division, the directors of a corporation shall not . . . authorize or ratify the withdrawal or distribution of any part of its assets among its shareholders.''

*wilful* or *negligent* violation of the above statute, the directors are jointly and severally liable to the corporation, its receiver, liquidator or trustee in bankruptcy, for the benefit of the creditors for corporate debts and liabilities existing at the time of the violation to the amount of any such unlawful withdrawal or distribution.[17] Any such liability may be enforced by an action brought by any one or more *judgment* creditors or by the corporation, its receiver, liquidator or trustee in bankruptcy *without* the necessity of any *prior judgment* against the corporation.[18]

It is clear that appellant does not fall within the class of persons authorized to enforce the liability imposed on the directors by sections 824 and 825 of the Corporations Code. Although appellant was a *creditor* of Atherwood and so found to be by the trial court, it was not a *judgment* creditor. We think that section 826 of the Corporations Code makes it plain that in the case of a creditor as distinguished from the persons specified in the second sentence of such section, it is necessary that there be a prior judgment recovered against the corporation. (See 13 Cal.Jur.2d, Corporations, § 347, p. 119; 39 Cal.L.Rev. 562.)

The judgment is affirmed.

Bray, P. J., and Molinari, J., concurred.

[17]Corporations Code section 825 provides: ''In case of any wilful or negligent violation of Section 824, the directors in office at the time of the violation, except those who have caused their dissent from the unlawful action to be entered on the minutes of the meeting at which the action was authorized, and those who were not present at the time the board acted, are jointly and severally liable to the corporation or to its receiver, liquidator, or trustee in bankruptcy, for the benefit of the creditors of the corporation or any of them and of the shareholders and owners of shares at the time of the violation, for its debts and liabilities existing at the time of the violation and for the full amount of any loss sustained by such holders and owners of shares, other than shares upon which any such payment or distribution was made, to the amount of the unlawful dividends, purchase price, withdrawal, or other distribution.''

[18]Corporations Code section 826 provides: ''Any one or more *judgment* creditors of the corporation whose debts or claims arose prior to the time of violation of Section 824 may sue the corporation and any or all of its directors in one action and recover judgment for the amount due them from the corporation against any or all of the directors guilty of the violation up to the amount of the unlawful dividends, purchase price, withdrawal, or other distribution. An action against such directors for any such violation may be brought by the corporation or by its receiver, liquidator, or trustee in bankruptcy, for the benefit of all such creditors, owners of shares, and shareholders, *without the necessity of any prior judgment against the corporation,* for the recovery of the amount of the unlawful dividends, purchase price, withdrawal, or other distribution as far as needed to satisfy such debts and liabilities and the full amount of loss sustained by such shareholders.'' (Italics added.)