[Civ. No. 30527.   Second Dist., Div. One.   Dec. 8, 1966.]

ISADORE TEACHER, Plaintiff and Respondent, v. HARRY LEDDEL, as Executor, etc., Defendant and Appellant.

Bernfeld & Cohen and Lee J. Cohen for Defendant and Appellant.

Brown, Grisham & Cawyer and Roy J. Brown for Plaintiff and Respondent.

LILLIE, J.—In March of 1962 plaintiff purchased from decedent Tenenbaum, a friend of many years, 999 shares of the capital stock of Jewelry Discount Corporation, paying therefor the sum of $99,000. In September of the same year, for reasons subsequently appearing, plaintiff became dissatisfied with his investment; at that time he had a conversation with decedent, asking the latter to repurchase the stock. According to plaintiff, Tenenbaum agreed to the repurchase for the sum originally paid ($99,000) at such later time as plaintiff should demand payment thereof upon two or three days' notice, such obligation to be evidenced by decedent's promissory note payable on demand. In this regard, decedent represented to plaintiff that while he could easily raise the sum in question and was completely solvent, he was then short of cash because of large orders previously placed to stock up his jewelry stores for the forthcoming Christmas season. Believing and relying on the above and related representations, plaintiff transferred his stock to Tenenbaum, who took title thereto in the fictitious name of American Jewelry Co., in return for Tenenbaum's demand note. On or about March 20, 1963, an interest payment was made concurrently with which a new note was executed in exchange for the original note. Tenenbaum died on May 13, 1963, without further payments having been made on the new note, and defendant Leddel succeeded to the shares' ownership as Tenenbaum's executor. Claiming that Tenenbaum's representations of his then financial position were false and that he did not learn thereof until after the latter's death, plaintiff served Leddel with a notice of rescission, and seasonably thereafter instituted this action in which he sought restoration of his original position as

owner of the stock. Judgment was entered for plaintiff;[1] defendant appeals therefrom.

Although stated in varying ways, the sole ground of appeal is the insufficiency of the evidence to support the finding that plaintiff proved a case for actionable fraud. More specifically, it is contended that none of the elements of fraud was established. ▇ The elements of fraud are summarized in *Hobart* v. *Hobart Estate Co.*, 26 Cal.2d 412 [159 P.2d 958], as follows: ''In general, to establish a cause of action for fraud or deceit plaintiff must prove that a material representation was made; that it was false; that defendants knew it to be untrue or did not have sufficient knowledge to warrant a belief that it was true; that it was made with an intent to induce plaintiff to act in reliance thereon; that plaintiff reasonably believed it to be true; that it was relied on by plaintiff; and that plaintiff suffered damage thereby.'' (P. 422.) While according recognition to the ''substantial evidence'' rule (*Crawford* v. *Southern Pac. Co.*, 3 Cal.2d 427, 429 [45 P.2d 183]) which generally governs claims of the type here advanced, defendant relies on a so-called limitation to the above rule, re-enunciated in *Hobart*, that where testimony is so inherently improbable and impossible of belief, it constitutes no evidence at all and is, therefore, wholly insufficient to support the judgment. (P. 426.) Thus, the question here is whether the challenged testimony, as it relates to the elements of fraud above summarized, belongs in that extraordinary category.

A resolution of the issue just stated requires a recital of the pivotal events which, under the familiar rule on appeal, must be viewed in a light most favorable to plaintiff as the prevailing party.[2] Upon plaintiff's purchase of the subject stock, Tenenbaum indicated that he would sign a voting trust agreement to be prepared by plaintiff's son, Theodore, a San Diego

---

[1] Such judgment provides in part that if plaintiff remits from his claim against the estate the sum of $5,940 (the interest payment) so as to reduce by that amount the sum sued for in the instant action and if plaintiff acknowledges, by an appropriate instrument filed with the court, that the note in his favor is canceled, then judgment shall be entered decreeing that the sale of the stock to Tenenbaum is set aside, that plaintiff is the owner of the subject shares and that defendant executor cause said shares to be transferred to plaintiff, and registered in his name, on the corporation's books.

[2] As a corollary of such rule, ''All of the evidence most favorable to the respondent must be accepted as true, and that unfavorable discarded as not having sufficient verity to be accepted by the trier of fact.'' (*Estate of Teel*, 25 Cal.2d 520, 527 [154 P.2d 384].)

attorney. When differences arose as to the terms of this agreement, plaintiff confronted Tenenbaum with the proposal for a repurchase of the stock: "'I told him that I was not satisfied under the condition that I had originally invested in the company, the Jewelry Discount Corporation, and I would like him to buy the stock back and give me my money. After discussing a few words, he says, 'Well, if you are dissatisfied, all right. I will buy it back from you.' I said, 'All right. Give me my money.' He says, 'Well, I will give you a note for it.' Right there and then I said, 'I am not interested in the note.' When I said I wasn't interested in the note, this is the first time I seen him so excited, and he said, 'What do you mean?' 'Well,' I says, 'I am not interested in the note alone.' Then he said to me, 'Well, are you afraid? I don't owe anybody any money at all. I am doing so much business in the discount house. You were there and saw it, and all I owe is the current bills.' I says, 'Well, I may need the money any day. I don't know when.' And he repeated again that all he owes is the current bills, and he says, 'You know, Mr. Teacher, you are an oldtime jeweler. You have got to buy now for the fall season, and I have got the money. I can pay if you press me. I would appreciate it if you wouldn't.' So I told him. 'That if everything what you say is true, that you owe only current bills, I may need the money any day, so if you give me a note on demand so I can get it in a day or two, I will accept it that way.' He says, 'Just give me a couple of days' notice and I will gladly get the money for you.' On those terms, taking his word for it, I took his note, which I haven't had experience in note demanding of anybody, but to me a demand note means 24 hours, get your money, so I took his note for it."

Plaintiff's son was present during the above conversation. He testified that his father said to Tenenbaum: " 'Well, since you and I can't get together in this voting trust of J.D.C., we have been friends for so long that I just want you to take your stock back, and I want my money.' " To this Tenenbaum replied: " 'Apparently we can't get together and it is all right with me. I will get you your money.' " When plaintiff stated, in reply to a question by Tenenbaum, that he wanted his money immediately, Tenenbaum said: " 'I could get you your money, but it is going to hurt me.' " According to the witness, Tenenbaum then "volunteered the fact that all his stores were doing so good. He quoted specific or approximations, I would say—figures—I didn't pay too much attention to the figures, but with all his stores and his J.D.C. store it

was in the millions, and then he ended up saying that he didn't owe anybody any money,'' adding that ''He was better financially off right now, he indicated, than he ever had been in his life, and he didn't owe anybody, except current suppliers; . . .''

Although Tenenbaum represented (as above) that all he owed ''was the current bills,'' Bert Schireson, a certified public accountant employed by defendant executor, testified that as of September 1, 1962 (the date of the conversation just set forth), the decedent was indebted to nontrade creditors in a sum exceeding two million dollars and that upon his death there was a claim against his estate by the federal government for unpaid taxes in the neighborhood of one million dollars; indeed, defendant admits in his briefs that the estate is presently insolvent but suggests that the purpose of the present action, said to have been conceived upon learning of such insolvency, is to circumvent the necessity of sharing pro rata with decedent's other creditors.[3]

█ While further conceding that Tenenbaum's representation (if made) of his financial ability to pay the note within a few days was a material representation inducing plaintiff to enter into the contract, he denies that it was false; the absence of such falsity, he therefore contends, is fatal to recovery at bar. In this connection reference is made to additional testimony by Mr. Schireson that while decedent's financial position had been deteriorating gradually for some years prior to the instant transaction with plaintiff, and continued to do so until his death some eight months later, in the opinion of the witness, decedent ''could have paid $100,000 during this period of time if called upon.'' This opinion is based upon figures collected from decedent's books which showed that in the interval between the issuance of the note and his death, receipts exceeded disbursements by some $1,693,245 (receipts being $3,702,515 less disbursements $2,109,270). Accordingly, defendant argues, payment of the sum reflected by the note would have amounted to only 2.7 percent of decedent's total receipts for the period in question; hence, he asks this court to consider this ''irrefutable'' evidence of decedent's ability to pay as convincing proof that the representation made by him

[3] Plaintiff, of course, had two remedies open to him when the asserted fraud was discovered: He could rescind, repudiating the contract, and seek restoration to his former position, or he could affirm the agreement, retain what he received and sue for damages. (*Paolini* v. *Sulprizio*, 201 Cal. 683 [258 P. 380].)

to plaintiff was not false but, to the contrary, completely true. But the opinion of a witness, expert or otherwise, is entitled to no more weight than any other kind of testimony, particularly when the reasons therefor are subject to question. We have in mind defendant's concession that decedent's estate is now insolvent,[4] which term has been employed to designate "a debtor whose entire assets are not sufficient to pay all his debts" or, "more frequently, a debtor who is not able to pay his debts in the usual course of business." (44 C.J.S. p. 339.)[5] Defendant does not say that decedent was solvent at the time of the instant transaction; he simply asserts that his receipts exceeded his disbursements. However, if that is the measure of a person's solvency, why must decedent's creditors (as defendant concedes) now expect payment pro rata and not in full? Perhaps decedent could have paid plaintiff by borrowing the money, thus "borrowing from Peter to pay Paul." But that, it seems to us, is not the test which should be applied to the present representation, namely, that Tenenbaum could pay the note on demand as a solvent businessman who owed nobody except his suppliers. As above shown, that statement was false and it materially induced plaintiff to transfer the stock back to Tenenbaum. All of the above circumstances, therefore, reasonably permitted the drawing of an inference favorable to plaintiff's position and adverse to that of decedent's legal representative; such inference having been drawn, it is conclusive at this stage of the litigation.

It was declared in *Vogelsang* v. *Wolpert*, 227 Cal.App. 2d 102 [38 Cal.Rptr. 440], that "Because of the diversity of factors and the differing intelligence of those guilty of fraud and their victims, the function of the trial judge in fraud cases is particularly significant. It is the duty of the judicial officer who sees and hears the witnesses to determine the weight and effect of their evidence; if there is any substantial showing of fraud the trial court must determine whether it outweighs the testimony presented by the opposing side; and his decision is ordinarily final in matters of this kind; appellate courts will not disturb a finding of fraud if there is any substantial evidence to support the lower court's decision." (P. 110.) The above declaration of the governing rule is

---

[4]The trial court found that at the time of the instant transaction decedent was "hopelessly insolvent, his assets amounting to around $1,700,-000 and his liabilities around $5,000,000."

[5]The term has a similar meaning under California statute. (Civ. Code, § 3439.02, subd. (a).) (See *T W M Homes, Inc.* v. *Atherwood Realty & Inv. Co.*, 214 Cal.App.2d 826, 843 [29 Cal.Rptr. 887].)

applicable to defendant's next contention that plaintiff had knowledge of facts which precluded him from justifiably relying on the subject representation. According to defendant, plaintiff had had a long experience in the jewelry business and should have known that Tenenbaum could not have been in need of cash for the acquisition of a Christmas inventory as early as September; and yet, defendant points out, plaintiff so testified and such testimony found its way into the court's findings: ". . . that he [Tenenbaum] was short of cash at that particular time for the reason that he had placed large orders for merchandise to stock up his jewelry stores for the forthcoming Christmas season; . . ." When confronted with the asserted implausibility of any such statement on Tenenbaum's part, however, plaintiff stated that it did not seem unusual to him that decedent needed the $100,000 on the first of September to pay for Christmas inventory; that he did not know what kind of merchandise Tenenbaum was handling or how he was running his various business enterprises. Thus, if the parties here possessed any "differing intelligence" (as stated in *Vogelsang*) on the facts in dispute, it was for the trial court to determine the weight and effect of the testimony indicative thereof. We are not unsympathetic, of course, to defendant's further point in this regard (which, incidentally, also blankets the entire appeal) that plaintiff's testimony relates to the asserted admissions of a dead man and accordingly should be viewed "with caution." (Code Civ. Proc., § 2061, subd. 4.) But again, such admonition is for the trial court and not this court. (*Ferrari* v. *Mambretti,* 58 Cal.App.2d 318, 322-323 [136 P.2d 326].)

Finally, defendant asserts that plaintiff's testimony is inherently improbable and impossible of belief because his credibility as a witness was impeached by several contradictions and by proof of the conviction of a felony (for which, however, he subsequently received a pardon). ▉ But it has been stated numerous times that testimony which discloses "unusual circumstances" is not sufficient to make it "inherently improbable" (*People* v. *Pettis,* 95 Cal.App.2d 790 [213 P.2d 731]); "Inherent improbability only exists when no reasonable person could believe the testimony." (*Tamble* v. *Downey,* 104 Cal.App.2d 810, 812 [232 P.2d 543].) Too, self-contradictions and inconsistencies in the testimony of a witness are matters which present merely questions for the trier of facts; they do not stamp the testimony of such a

witness as "inherently incredible." (*Jones* v.*Re-Mine Oil Co.*, 47 Cal.App.2d 832 [119 P.2d 219].)

The judgment is affirmed.

Wood, P. J., and Fourt, J., concurred.